JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| WILLIAM BURRIS | SAINT CHARLES BORROMEO ROMAN CATHOLIC SEMINARY and MAIN LINE HEALTH SYSTEM |

**(b)** County of Residence of First Listed Plaintiff   Burlington County, New Jersey
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Montgomery County, PA
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Paul R. Rosen, Esq./Andrew J. DeFalco, Esq.
Spector Gadon & Rosen, P.C.
1635 Market Street
Philadelphia PA 19103
215-241-8888

Attorneys *(If Known)*
Paige Macdonald-Matthes, Esquire, Obermayer Rebman Maxwell & Hippel 200 Locust Street, Suite 400, Harrisburg, PA 17010; David Smith, Esquire. Schnader Harrison Segal & Lewis LLP, 1600 Market Street, Suite 3600, Philadelphia, Pennsylvania 19103

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government Plaintiff

☐ 3  Federal Question *(U.S. Government Not a Party)*

☐ 2  U.S. Government Defendant

☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☒ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☒ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from Another District *(specify)*   ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
N/a

Brief description of cause:
Action for breach of fiduciary duty, and aiding and abetting same, predicated upon Plaintiff's partner usurping a corporate opportunity.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ Over $150,000

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions:)*   JUDGE _____   DOCKET NUMBER _____

DATE
02/03/2016

SIGNATURE OF ATTORNEY OF RECORD
Andrew J DeFalco / PD No. 84360

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA -- DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.**

Address of Plaintiff: 8 East Main Street, Moorestown, New Jersey 08057
Address of Defendant: : (1)  Main Line Health System; 259 North Radnor-Chester Road, Suite 290, Radnor, Pennsylvania 19087; (2)  Saint Charles Borromeo Seminary; 100 East Wynnewood Road, Wynnewood, Pennsylvania 19096
Place of Accident, Incident or Transaction:  Montgomery County, Pennsylvania

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?                                    Yes ☐   No ☒

Does this case have multidistrict litigation possibilities?                    Yes ☐   No ☒

RELATED CASE IF ANY:  N/a

Case Number:                           Judge                        Date Terminated

Civil cases are deemed related when yes is answered to any of the following questions:
1.  Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?                    Yes ☐   No ☒
2.  Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?                                            Yes ☐   No ☒
3.  Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?                                       Yes ☐   No ☒
4.   Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the ame individual?                           Yes ☐   No ☒

CIVIL: (Place in *ONE CATEGORY ONLY*)

A. *Federal Question Cases:*
1. ☐ Indemnity Contract, Marine Contract, and All Other  Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
   (please specify) 7 U.S.C. Section 499(a)

B. *Diversity Jurisdiction Cases:*
1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability - Asbestos
9. ☒ All other Diversity Cases
   (Please specify):  Action for breach of fiduciary duty, and aiding and abetting same, predicated upon Plaintiff's partner usurping a corporate opportunity

### ARBITRATION CERTIFICATION
*(Check appropriate Category)*

I, Andrew J. DeFalco, Esquire, do hereby certify:

☒  Pursuant to Local Civil Rule 8, Section 4(a)(2), that, to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000 exclusive of interest and cost;

☒  Relief other than monetary damages is sought.

Date: February 3, 2016 _____     _____
                                                *Andrew J. DeFalco, Esquire*

NOTE:  A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

Date: February 3, 2016 _____     _____
                                                *Andrew J. DeFalco, Esquire*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CASE MANAGEMENT TRACK DESIGNATION FORM**

| | | |
|---|---|---|
| WILLIAM BURRIS | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | No. |
| MAIN LINE HEALTH SYSTEM, AND | : | |
| SAINT CHARLES BORROMEO ROMAN | : | |
| CATHOLIC SEMINARY | : | |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a)     Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.   ( )

(b)     Social Security – Cases requesting review of a decision of the Secretary of
        Health and Human Services denying plaintiff Social Security Benefits.     ( )

(c)     Arbitration – Cases required to be designated for arbitration under Local
        Civil Rule 53.2.                                                          ( )

(d)     Asbestos – Cases involving claims for personal injury or property damage
        From exposure to asbestos.                                               ( )

(e)     Special Management – Cases that do not fall into tracks (a) through (d) that
        Are commonly referred to as complex and that need special or intense management
        by the court. (See reverse side of this form for a detailed explanation of special
        management cases.)                                                       ( )

(f)     Standard Management – Cases that do not fall into any one of the other
        tracks.                                                                  (X)

| | | |
|---|---|---|
| _02/03/16_ | _Andrew J. DeFalco, Esquire_ | |
| Date | Attorney-at-law | Attorney for Plaintiff |
| | | |
| _215/241-8809_ | _215/214-8844_ | _adefalco@lawsgr.com_ |
| Telephone | FAX Number | E-Mail Address |

(Civ. 660) 10/02

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WILLIAM BURRIS<br>8 East Main Street<br>Moorestown, New Jersey 08057<br><br>                         Plaintiff<br><br>v.<br><br>MAIN LINE HEALTH SYSTEM<br>259 North Radnor-Chester Road, Suite 290<br>Radnor, Pennsylvania 19087<br><br>and<br><br>SAINT CHARLES BORROMEO ROMAN CATHOLIC<br>SEMINARY<br>100 East Wynnewood Road<br>Wynnewood, Pennsylvania 19096<br><br>                         Defendants. | Civil Action No. _____ |

## COMPLAINT

Plaintiff, William Burris ("Burris" or "Plaintiff") for his Complaint against Defendants Main Line Health System ("Main Line") and Saint Charles Borromeo Roman Catholic Seminary ("Seminary") (collectively "Defendants"), states as follows:

## INTRODUCTION

1.      Plaintiff seeks equitable relief and damages in this case.

2.      After Plaintiff initiated and pursued for almost three (3) years the acquisition of a parcel (the "Parcel") of property owned and placed for sale by Defendant Seminary, and Plaintiff introduced Main Line to the Seminary and thereafter entered into a joint venture/partnership/confidential relationship with Main Line, Plaintiff and Main Line submitted their partnership's offer to the Seminary to acquire and develop the Parcel as co-promoters. After the Seminary heard this presentation, it continued to finalize its

relationship with the joint venture/partnership/confidential relationship.  During these negotiations, Seminary was intimately aware of the confidential and fiduciary relationship between Plaintiff and Main Line.

3.     In furtherance of the joint venture/partnership/confidential relationship, in reliance on the fiduciary relationship, and with Seminary's full knowledge, Plaintiff provided to Main Line sensitive confidential information and valuable work product.

4.     However, Main Line recently turned its back on its co-venturer/partner, and its existing fiduciary duties of loyalty, full disclosure, and honesty, which precluded Main Line from usurping for its own benefit the acquisition of the Parcel.

5.     Instead of working with Plaintiff to secure the acquisition of the Parcel for their co-venture, Main Line went behind Plaintiff's back, and engaged in secret negotiations with Seminary, which knew of the relationship between Plaintiff and Main Line, but disregarded it.  Ultimately, after the Board of Directors of both Main Line and Seminary secretly gave approval, Main Line and Seminary concealed this conduct, led the Plaintiff to believe that Seminary was still in negotiations with the Plaintiff and the joint venture/partnership, but in fact the Defendants entered into a secret agreement for Main Line to obtain the Parcel solely for its own benefit, without the involvement of its partner/co-venturer/confidential relationship, the Plaintiff.

6.     Both Defendants admitted to Plaintiff that an agreement to purchase the Parcel exists, but they are now attempting to now deny that such an agreement exists, because they do not yet have a formal writing, to enable them to transfer the Parcel at a later date to Main Line without Plaintiff's involvement.

7.      Accordingly, through this Complaint, Plaintiff now seeks to recover for Main Line's breaches of fiduciary duty, self-dealing, usurpation of the opportunity that rightfully belonged to the joint venture/partnership/confidential relationship, tortious interference, unfair competition, conversion, and unjust enrichment, as well as Seminary's aiding and abetting of those breaches, and the conspiracy formed between the two to effectuate the tortious conduct.

8.      Plaintiff also respectfully asks that the Court Order that the Parcel subject to the agreement to purchase the Parcel be enforced and held in a constructive trust for the benefit of the Plaintiff and the venture that Plaintiff formed with Main Line. To the extent that an enforceable agreement is not in place, Plaintiff respectfully requests that the Court enter a permanent injunction precluding Main Line from acquiring any interest in the Parcel without the Plaintiff's consent.

## PARTIES

9.      Plaintiff William Burris is an adult individual and a resident of the State of New Jersey, with a business address located at 8 East Main Street, Moorestown, New Jersey 08057.

10.     Defendant Main Line Health System ("Main Line") is a not-for-profit health system organized and existing under the laws of the Commonwealth of Pennsylvania, with a home office and principal place of business located at 259 North Radnor-Chester Road, Suite 290, Radnor, Pennsylvania 19087.

11.     Defendant Saint Charles Borromeo Society d/b/a Saint Charles Borromeo Roman Catholic Seminary ("Seminary") is a not-for-profit organization existing under

the laws of the Commonwealth of Pennsylvania, with a principal place of business located at 100 East Wynnewood Road, Wynnewood, Pennsylvania 19096.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy in this matter exceeds the sum or value of $75,000, and is between citizens of different states.

13.     Venue in this Judicial District is proper pursuant to 28 U.S.C. § 1391 (a) and (c), because the Defendants reside in this Judicial District, and a substantial part of the events and/or omissions giving rise to the claim occurred in this Judicial District.

## FACTS COMMON TO ALL COUNTS

**A.     BURRIS LEARNED THAT THE SEMINARY INTENDED TO PLACE A PARCEL ON ITS GROUNDS FOR SALE, AND PURSUED THE ACQUISITION OF THAT PARCEL**

14.     Defendant William Burris ("Burris") is the Chairman and Chief Executive Officer of various entities that develop, redevelop and operate Post-acute Care Centers in the tri-state area.

15.     Burris is also a practicing Catholic who is committed to supporting Catholic charities and the Catholic Church.

16.     In 2013, Burris learned through an article in the Philadelphia Inquirer that the Archdiocese of Philadelphia planned to place a parcel of land (the "Parcel") on the grounds of the Saint Charles Borromeo Seminary (the "Seminary") in Wynnewood, Pennsylvania for sale.

17.     The Seminary grounds, and the Parcel, are one of the most unique, historic, beautiful and pastoral pieces of land in the entire United States, and as a practicing Catholic, Burris considered the opportunity to pursue the acquisition of the

Parcel to be a blessing.  As part of his plan, Burris wanted to maintain the historic Church and Seminary buildings for the benefit of the Seminary.

18.     Accordingly, beginning in March 2013, Burris contacted the Archbishop of Philadelphia, and His Excellency Bishop Timothy Senior ("Bishop Senior"), the Rector of the Seminary, among others including Stephen Cohen, an accountant affiliated with the Seminary, to inquire as to the possibility of acquiring the Parcel to construct, open and operate a Post-acute Care Center on the Parcel grounds (the "Project"), and to establish that Burris (through his construction company, through a different company of which he is principal, or through a newly-formed entity) was an appropriate candidate for the acquisition.  Burris continued to make inquiries and proposals throughout 2013.

**B.     <u>BURRIS BRINGS MAIN LINE HEALTH INTO THE ENTERPRISE AS A CO-PROMOTER</u>**

19.     The Seminary and the Parcel are located on land that is adjacent to Lankenau Hospital, owned by Defendant Main Line Health System ("Main Line").  Main Line owns and operates, *inter alia*, a hospital and rehabilitation centers that are, or have the potential to be, competitive with Plaintiff's businesses.

20.     Because Main Line was (and is) an owner of land adjacent to the Parcel, Burris was encouraged by members of the Board of Directors of the Seminary to meet with Main Line and its President, John "Jack" Lynch, III ("Lynch").   Since the project would need approvals, and the businesses seemed to relate to one another, the Seminary was concerned Main Line would oppose the plan, thus delaying ultimate approval.

21.     Burris then attempted to arrange a meeting between Lynch and the Seminary.  Initially, in April 2014 Bishop Senior and other decision-makers at the Seminary refused to meet with Lynch and others from Main Line.

22.     However, Burris continued to seek Main Line's participation because he felt that it would ultimately benefit the Project.  Therefore, Burris wanted to include Lynch in meetings relating to the proposed acquisition, to obtain Main Line's support for the Project and the Seminary's blessing for their participation.

23.     In June 2014, Burris took Lynch on a tour of certain Post-acute Care Centers he was developing in New Jersey.  Based on Lynch's positive impression of Burris' Centers and methods of doing business, and hopeful that he could duplicate those successes with operations on the Parcel, Lynch communicated to Burris that not only would he support the project, but since he was very favorably impressed by Burris' facility, he wanted to form a relationship for the joint development of the Parcel, stating "I [Main Line] want in."  However, the specific nature of Main Line's involvement had not been decided at that time.  Lynch also gave to Burris permission to advise Bishop Senior that "he was in."

24.     Also, after being "blown away" by the visit to Burris' Post-acute Care Center, Lynch sent an e-mail to Bishop Senior formally confirming Main Line's involvement in the Project (i.e., that Main Line was "in"), and stating:

> [Main Line Health is] very supportive of a "Senior Living" concept in the neighborhood and believe the proximity to Lankenau Medical Center is mutually beneficial to the residents of the facilities as well as to patients being discharged from Lankenau who need those type of beds.
>
> While we have not reached a formal agreement with Bill and his team, we are in the process of developing a relationship that would include our participation in the operation of the facilities.

25.     Bishop Senior responded to this e-mail by thanking Lynch for his presentation and indicating that he wished to have further discussions.  Of course, this

463847_1

was due to Burris' introduction of Main Line to form a joint venture, since Bishop Senior previously refused to even meet with Lynch.

C.    **BURRIS AND MAIN LINE HEALTH PURSUE THE ACQUISITION AS A PARTNERSHIP/JOINT VENTURE/CONFIDENTIAL RELATIONSHIP**

26.    Burris and Main Line then became co-promoters of a partnership/joint venture/confidential relationship to acquire the Parcel for the purpose of building and operating a Post-acute Care Center on the Parcel, carrying Main Line's name and access from Main Line's Lankenau Hospital grounds, and other facilities under Burris' control devoted to patient care, and shared information, resources and ideas in order to bring the subject of their co-promotion and partnership/joint venture/confidential relationship to fruition.  The partnership/joint venture/confidential relationship that was formed and pursued the opportunity with Seminary between Main Line and Burris will be referenced herein as the "Burris-Main Line Fiduciary Venture."

27.    The parties began to pursue the Burris-Main Line Fiduciary Venture to acquire and develop the Parcel with Seminary and its counsel, with the understanding that simultaneously upon confirmation of the acquisition of the Parcel, Main Line and Burris would document their formal agreement as a joint venture/partnership.

28.    As co-promoters, Burris and Main Line then engaged in communications with Jeffrey Julien of HFF, the Seminary's broker for the Parcel, as well as communications with Seminary's representatives.

29.    As part of the vetting process by Seminary's broker HFF, the Burris-Main Line Fiduciary Venture was asked to fill out a detailed "Buyer Qualification Questionnaire" ("BQQ") form with specific questions posed by Seminary, as co-promoters of the opportunity.  The BQQ was to be presented to the Board as the proposal

of the Burris-Main Line Fiduciary Venture at a meeting of the decision-makers at the Seminary, for their decision on the purchaser at a meeting in late October 2014.

30.     Burris worked with Main Line and Lynch, as well as his own staff, to prepare the responses to the BQQ, and Burris' team met and communicated with Lynch at length to ensure that the Burris-Main Line Fiduciary Venture provided the appropriate responses.

31.     At or around this time, HFF sought to confirm the proposed meeting with Bishop Senior and Stephen P. Dolan, Jr. ("Dolan"), Chief Financial Officer of the Seminary, and the Seminary Board for the presentation of the proposal of the joint venture/partnership for the purchase of the Seminary Parcel, but it contacted only Burris to set the meeting.  Burris made sure that his co-promoter and co-venturer/partner, Lynch, was invited, and would present on behalf of the Burris-Main Line Fiduciary Venture, at this meeting.

32.     Thus, as of late October 2014, prior to the Board meeting to make the presentation for the purchase of the Seminary Parcel, Lynch and Main Line had confirmed that they would partner/joint venture with Burris to participate in the operation of the Post-acute Care Centers on the Parcel.

33.     Based upon this confirmation of the Burris-Main Line Fiduciary Venture, Burris made sure that Lynch was copied on relevant correspondence, advised as to all developments, had input as to relevant decisions, and would be present with Burris for the October 29, 2014 meeting to present the co-promoters' offer as partners/joint venturers in the development and operation of the facilities.

34.     The Burris-Main Line Fiduciary Venture completed and submitted the BQQ on October 29, 2014, with the full approval and agreement of Lynch as to all of its content.  [See Exhibit "1"]

35.     Based on this approval, Burris was authorized to again confirm that the partnership/joint venture with Main Line was the purchaser in the formal presentation to the Seminary in the BQQ, stating:

> **Burris, in partnership with Main Line Health, proposes to retain the existing seminary building, including the chapel, and redevelop it with 166 senior living units and some office space, build a 90,000 square foot 124 private room Post-acute Care Facility, a 21,000 square foot Urgent Care Facility and a 104 unit Assisted Living Facility.**

[Ex. "1"]

36.     On October 29, 2014, Lynch and Burris met with the Seminary Board, as well as members of the Seminary Real Estate Committee which would approve the purchaser.  Both Lynch and Burris presented orally, as co-promoters, to the Seminary Board that they were partners in the development and operation of the facilities to be developed on the Seminary Parcel, with facilities developed by Burris, and operated and controlled by Burris and Main Line, if selected by the Seminary Board to go forward with the purchase.  The presentation went very well.  It went so well that Burris and Main Line were advised by HFF that the decision to be made by the Seminary was "down to two participants … [the joint venture/partnership] and Cross Properties."

37.     The Seminary then, through HFF, advised Plaintiff and Main Line that the presentation by the Burris-Main Line Fiduciary Venture was accepted.  Specifically, on December 2, 2014, Julien of HFF informed Burris that the "deal is yours," meaning that the Burris-Main Line Fiduciary Venture between Burris and Main Line would be given

the opportunity to acquire the Parcel, and the next step would be to document the agreement with Seminary to pursue the deal.  Thus, Julien asked Burris to "submit a [letter of intent] with final terms and responses," and after that was submitted, the Burris-Main Line Fiduciary Venture and Seminary would "start negotiating the ground lease document."  Burris then used one of his entities, disclosed during his presentation, to commence the implementation.

38.     Thereafter, as part of his duties as partner/co-venturer/confidential relation, Burris continued to work with Lynch to solidify their position.

39.     Further, since his pursuit of the Parcel and the Project began, Burris spent hundreds of thousands of dollars, and devoted thousands of man-hours, to the co-promotion of the Project and the pursuit of the acquisition of the Parcel.  For example (and not by way of limitation), Burris, through his companies:

(a)     engaged in numerous traffic studies and reports,

(b)     paid for and created an enormous amount of construction and technical drawings,

(c)     engaged civil engineers who generated *inter alia* site plans and other plans,

(d)     engaged legal counsel to deal with legal issues incident to the transaction such as zoning, land use and development issues,

(e)     engaged two architectural firms to create plans to match and enhance the existing architecture of the Seminary buildings and campus, and create presentation-quality renderings,

(f)     engaged a "planner" for dealing with land development and zoning issues,

(g)     held multiple meetings with neighborhood preservation groups,

(h)    held (along with Main Line) multiple meetings including a meeting with the Council for the Township of Lower Merion, and the Township Planning and Engineering Professionals,

(i)    engaged appraisers who provided multiple appraisals,

(j)    lined up investors such as Steve Katz, David Mandelbaum, and others, and

(k)    performed a significant amount of work for community relations.

(Herein the "Burris Work").

40.    Based upon the formation, co-promotion and confirmation of the Burris-Main Line Fiduciary Venture to pursue the acquisition of the Parcel and the Project between Burris and Main Line, Burris shared **all** of the (competitively sensitive) Burris Work with Main Line, and gave Main Line the full benefit of all of this Burris Work (only to have them go behind Burris' back and, using the benefit of all of this work, steal the deal out from under him, as set forth below).

41.    In addition to the appraisals, architectural plans and other Burris Work set forth above, Burris also shared with Main Line, in reliance on the Burris-Main Line Fiduciary Venture and in furtherance of the co-promotion of the opportunity, Burris' unique and proprietary business model, as well as all of the financial projections, pricing formulas, pro-formas, due diligence, technical construction drawings, traffic studies, methods, know-how, plans and specifications, strategy, and goodwill of his companies, in order to make the partnership/joint venture successful.  Once Main Line received this information (which, as a potential competitor, Burris would never have provided to Main Line without the Burris-Main Line Fiduciary Venture), Main Line performed extensive due diligence using these materials.  Thereafter, Main Line would repeatedly vet, fine

tune, and seek additional information pursuant to the partnership/joint venture, which was always provided.

42.    As a result, regardless of the ultimate structure of the relationship between Plaintiff and Main Line, at all times material there existed a confidential fiduciary relationship, and a relationship of trust and confidence between them that gave rise to duties of, *inter alia*, loyalty, honesty, candor and full disclosure, which precluded Main Line from usurping opportunities belonging to the enterprise composed of Main Line and Plaintiff, and self-dealing.

43.    Then, as the deal was unfolding, Main Line discussed that for certain business reasons relating to Bryn Mawr's involvement in the Post-acute Care Center, Main Line would not be a purchaser of equity, but would give all of the equity to Burris, and Main Line wished to take its profit, as a partner/joint venturer, as a larger percentage share of the gross receipts from the Post-acute Care Center, the same as if Main Line were a co-owner.  In this construct, everything that was presented to the Seminary would be the same as the parties previously contemplated for the Project, Burris would develop the Parcel, and would then share the control of the Post-acute Care Center with Main Line, with Main Line's name and existing brand on the facility.  Burris made it clear that he would complete the acquisition, and that the parties would make the Burris-Main Line Fiduciary Venture work that way when they consummated the deal with the Seminary.

44.    Further, Main Line made it clear that following the acquisition, both parties to the Burris-Main Line Fiduciary Venture, Burris and Main Line, would continue to be partners/co-venturers/parties in a confidential relationship, and jointly and equally control the operations, governance and management of the facilities.  In fact, Main Line

463847_1

advised that "in partnership with Burris," the general manager selected would be a co-partner for the operation of the facility, and both parties would be responsible as owners "for the safe and efficient operation of the facility."

45.    Further, there were other contributions that Main Line intended to make to the Burris-Main Line Fiduciary Venture that were invaluable.  For example, Main Line agreed to permit the joint venture/partnership to construct modes of ingress and egress from Lankenau Hospital.

46.    Burris said that he would agree to this form of Burris-Main Line Fiduciary Venture, and that this arrangement would be formally documented with the deal with Seminary was finalized.  Thus, as of May 2015, Burris was authorized to continue to represent to the Seminary the original presentation that that "our deal with Main Line Health is [Main Line] will operate the Post-acute Center as an extension of the Lankenau Brand."

47.    On June 23, 2015, Burris, on behalf of the Burris-Main Line Fiduciary Venture, was authorized to communicate to Seminary's counsel that Main Line planned to manage and operate the Post-acute Care Center, and that "we have mutually agreed to pursue a final agreement once a deal is reached" with the Seminary.

48.    Burris then set about what he believed to be finalizing the economic terms that would permit the acquisition of the Parcel.  As of July 17, 2015, Burris offered $25,000,000 to acquire the Parcel from Seminary to pursue the Project for the Burris-Main Line Fiduciary Venture.

49.    However, at that time, Burris was advised that all discussions had to be placed on hold, as the Seminary and the Archdiocese of Philadelphia would be busy over

the summer planning for the visit of Pope Francis in September 2015. Burris was told that discussions would resume after the Papal visit.

**D.   MAIN LINE AND SEMINARY ENTER INTO SECRET NEGOTIATIONS, AND REACH A DEAL FOR MAIN LINE TO CUT OUT ITS CO-VENTURER/PARTNER/CONFIDENTIAL RELATIONSHIP, AND ACQUIRE THE PARCEL WITHOUT BURRIS' INVOLVEMENT**

50.    Upon information and belief, unbeknownst to Burris, Main Line and Seminary began a series of secret discussions relating to Main Line's interest in acquiring the Parcel without the involvement of Burris or the Burris-Main Line Fiduciary Venture.

51.    Main Line was aware that the Seminary wanted an "unconditional" acquisition of the Parcel, and that Main Line and Burris, as a partnership/joint venture, decided that it could not offer and unconditional purchase price because of the need for approvals and financing for Burris to obtain the equity and develop the Post-acute Care Center and the balance of the parcel for the joint venture/partnership.

52.    Further, Main Line made it clear to its partner/co-venturer Burris that it was not a buyer of equity, but it was still a partner in the development, and would control and share in the profits of the Burris-Main Line Fiduciary Venture through excessive distributions from the Post-acute Care Center.

53.    Using the knowledge of Plaintiff's prior negotiations (acquired through the confidential relationship) to its advantage, and its misrepresentations to Burris of its lack of desire to become an owner of the Parcel, Main Line secretly agreed with the Seminary that unlike Burris' previous offers, which were necessarily conditioned upon various issues such as zoning and permitting, Main Line would make an "unconditional" offer for the purchase of the Parcel independently of Main Line's relationship with Burris, and without involving Burris.

54.    Upon information and belief, Main Line could circumvent the need for zoning and permitting, and other conditions of an offer, by agreeing that upon an independent and unconditional purchase for the right price, Main Line would not immediately build on the Parcel, but would instead "land bank" the Parcel for future use. Thus, Main Line believed that its so-called "unconditional" offer would be superior to the offer made by its partner, Burris, for the Burris-Main Line Fiduciary Venture.

55.    Following the Papal visit, Burris began once again to pursue the acquisition of the Parcel and the Project.  On October 5, 2015, Burris was advised by Dolan that the previous offer of $25,000,000 was now ready and being discussed, but certain issues needed to be resolved.  The Seminary asked for and received continued assurances from Burris that the entrance to the Parcel from the Lankenau Hospital grounds was still part of the plan, and that Main Line would operate the Post-acute Care Center under its brand.

56.    Burris was given a status report on October 15, 2015, stating that progress had been made and the approvals were moving along in due course.

57.    Thus, as of October 15, Burris was advised that the Burris-Main Line Fiduciary Venture had cleared two of the major hurdles of approvals, and only one remaining step, the Archdiocese Real Estate Committee, remained.

58.    At no time prior to November 2015 did Main Line or Seminary ever advise Burris that Main Line was in secret negotiations to take the deal away from Burris and the Burris-Main Line Fiduciary Venture, and that Main Line had made independent offers for an "unconditional" purchase of the Parcel without Burris' involvement and outside of the Burris-Main Line Fiduciary Venture.

59.    Then, on November 19, 2015, after Burris was advised that "the offers were discussed at the Seminary Board meeting and now the Finance Committee [and others were] reviewing the proposals to ensure the seminary makes the correct decision." This concerned Burris greatly, because he was completely unaware that there were any other proposals or "offers" that were under consideration, Burris had previously been advised by the Seminary through its exclusive agent HFF that the "deal was yours," and nothing had been disclosed to Burris that there was any change.

60.    Thus, on December 4, 2015, Burris wrote to Bishop Senior, asking him what was happening, whether he fell out of favor, and that Burris observed that there appeared to be another "stalking horse in the deal."

61.    After receiving no response for several days, on December 9, 2015, Burris received a telephone call from Dolan.  On this call, Dolan stated that "a deal has been entered into between the Seminary Board and Main Line Health" to effectuate the sale of the Parcel without Plaintiff's involvement.  Burris was completely shocked, as he had no idea that his co-promoter and partner/co-venturer/confidential relationship was even thinking about acquiring the Parcel, having previously advised Burris that it had no interest in acquiring the Parcel.

62.    Neither Main Line, nor Seminary, ever advised Burris that his co-promoter and partner/co-venturer/confidential relationship Main Line and Seminary were having secret discussions for Main Line to purchase the Parcel.

63.    After speaking with Dolan, who confirmed that a deal was made for Main Line to acquire the Parcel, Burris immediately contacted Lynch.  Lynch also confirmed that a deal had been made for Main Line to purchase the Parcel from the Seminary.

64.     Lynch stated Burris did a great job getting his (Lynch's) people enthusiastic about the acquisition and the Project. Lynch advised Burris that Penn Medicine was interested in purchasing the Parcel, and he therefore went to Main Line's Board of Directors to seek permission to acquire the Parcel, and to make an unconditional offer to acquire the Parcel as a "land bank" investment.

65.     Lynch advised that the Main Line Board of Directors gave its approval for Main Line to purchase the Parcel, and that it would later decide what kind of venture it wished to pursue on the Parcel. However, any venture pursued by Main Line on the Parcel would compete with Burris' existing business.

66.     Lynch commented that he would gladly consider Burris as a "developer" and promised to get back to Burris.

67.     Following these conversations, it became clear that Main Line now intends to usurp all of the Burris Work, and utilize all of the proprietary and confidential information Burris provided to his co-promoter and co-venturer/partner/confidential relationship, for the benefit of Main Line and Seminary, excluding Burris, such that Plaintiff's partner/co-venturer/confidential relationship that Burris introduced into the Project as a co-promoter was then (and is now) secretly self-dealing with the Seminary to cut Burris out of the Project he envisioned and worked for years to put together.

68.     Then, after waiting 12 days during which Lynch failed to "get back" to Burris, Burris contacted counsel, who initiated a since-discontinued action, upon a writ of summons and a request for pre-complaint discovery in Montgomery County, Pennsylvania, based upon the specific admissions from both Lynch (of Main Line) and Dolan (of the Seminary) that a deal was in place for Main Line to purchase the Parcel

without Burris' involvement.  Upon information and belief, Main Line and Seminary agreed that although a deal was in place to have Main Line purchase the Parcel, the transaction would not be documented and completed until after the lawsuit.  This agreement was made to permit both Seminary and Main Line to deny the existence of the agreement to sell, to permit both to argue that Main Line has no existing interest in the property, all in order to defeat Burris' rights and permit Main Line to purchase the property free and clear of Burris' interests.

69.     The action Burris initiated in Montgomery County was solely to initiate suit by way of a writ in equity, without making any public allegations against the Seminary relating to its conduct, and a *lis pendens* to protect Burris from a sale, and then to attempt to negotiate with the Defendants in order to return the parties to the status quo. In other words, Burris initiated that action to save the deal that he thought he had for several years, and put the Burris-Main Line Fiduciary Venture back on track.  However, instead of negotiating with Burris, Seminary and Main Line resisted discovery, filed an emergency motion to prevent any relief and strike the *lis pendens*, and refused to provide any documents relating to their negotiations, other than to say that no formal agreement of sale existed, and to claim that no relationship ever existed between Burris and Main Line because no formal partnership type of agreement was signed.

70.     The litigation then began to escalate.  After all negotiations or filings (including Plaintiffs' amending and/or withdrawing its *lis pendens)* to create a settlement and prevent the litigation from escalating were ineffective, and the parties were unable to create any potential relationship to proceed in the development envisioned by the parties

in the Burris-Main Line Fiduciary Venture,   Burris withdrew the writ of summons, and

filed the within Complaint in this Court.

## COUNT I
## (BREACH OF FIDUCIARY DUTY)

### PLAINTIFF v. MAIN LINE

71.     Plaintiff incorporates by reference each of the foregoing Paragraphs of this

Complaint as though fully set forth at length herein.

72.     As co-promoters of the Project, Burris and Main Line expressly and/or

impliedly created a partnership/joint venture/confidential relationship to pursue the

Project and the acquisition of the Parcel, arising from the clear intent and mutual assent

of the parties manifesting an intention that they be considered a partnership/joint

venture/confidential relationship.  Further, both Burris on the one hand, and Main Line on

the other, made contributions of, *inter alia*, capital, skill, knowledge, materials, influence

and/or money, and intended to exercise mutual control over the subject matter and divide

earnings according to their agreement.

73.     Moreover, regardless of the final role that each would play in the Project,

Burris and Main Line were co-promoters, they agreed to the partnership relationship

when presenting the joint development project to the Seminary, they disclosed to the

Defendant Seminary that they intended to be a joint venture and partners, and they are

thus co-venturers/partners and/or in a confidential relationship by virtue of the fact that

they were co-promoters to the Project and the enterprise.  Further, each made their own

unique contributions to the consummation of the acquisition of the Parcel and the

consummation of the Project, and Burris shared all of his valuable and proprietary Burris

Work, Burris' unique and proprietary business model, business plans, pricing methods,

financial projections, pro-formas, due diligence, technical construction drawings, traffic studies, methods, know-how, plans and specifications, strategy, goodwill, preparation and information relating to Burris' negotiations with Main Line, in reliance on the partnership/joint venture/confidential relationship. Accordingly, even in the absence of a formal partnership/joint venture, a confidential relationship existed between Main Line and Plaintiff giving rise to fiduciary duties.

74.    As a result, Main Line owed, at all times material, a fiduciary duty to Burris, of the utmost good faith, and to act towards Burris with scrupulous honesty. Main Line also owed fiduciary duties of care, loyalty, good faith, and full disclosure to Burris, which precluded Main Line from self-dealing and usurping for its own benefit opportunities that rightfully belong to the enterprise.

75.    As part of its fiduciary duties set forth above, Main Line was precluded from secretly negotiating for, and taking for its own purposes without informing Plaintiff of its conduct, an opportunity belonging to the Burris-Main Line Fiduciary Venture: the acquisition of the Parcel that was at all times material the goal and purpose of the Burris-Main Line Fiduciary Venture.

76.    By secretly engaging in clandestine negotiations with Seminary for the purchase of the Parcel, by using information belonging to Burris-Main Line Fiduciary Venture to the detriment of the Plaintiff, by making a secret "unconditional" offer for the purchase of the Parcel without Plaintiff's involvement, and by entering into an agreement of sale with Seminary for the purchase of the Parcel without Plaintiff's involvement, Main Line breached the fiduciary duties set forth above, including the duties of good faith, loyalty, faithfulness, candor and full disclosure, and honesty, and took for itself

opportunities rightfully belonging to the Burris-Main Line Fiduciary Venture and engaged in self-dealing.

77.     Main Line failed to advise Plaintiff of its secret negotiations, offer, and agreement relating to the Parcel, and failed to offer the opportunity rightfully belonging to the Burris-Main Line Fiduciary Venture, a confidential relationship, and Plaintiff.

78.     Main Line's conduct, its breach of the fiduciary duties of *inter* good faith, loyalty, faithfulness, candor and full disclosure, and Main Line's self-dealing and usurpation of the opportunity belonging to the Burris-Main Line Fiduciary Venture and Plaintiff, using *inter alia* the valuable and proprietary Burris Work, Burris' unique and proprietary business model, business plans, financial projections, pro-formas, due diligence, technical construction drawings, traffic studies, methods, know-how, plans and specifications, strategy, goodwill, preparation and information relating to prior negotiations to benefit Main Line at the expense of Plaintiff, has harmed the Plaintiff and the Burris-Main Line Fiduciary Venture by robbing the Burris-Main Line Fiduciary Venture of the opportunity that it was formed to obtain, by robbing the Plaintiff of the benefit of the Burris-Main Line Fiduciary Venture, and by converting and using for its own purposes all of the valuable and proprietary Burris Work, skill, know-how, business models, business plans, preparation and resources invested by Plaintiff in the partnership/joint venture/confidential relationship.

79.     As a result of the conduct set forth above and the diversion of the opportunity belonging to the Burris-Main Line Fiduciary Venture, Plaintiff and the Burris-Main Line Fiduciary Venture have suffered damages in an amount to be proven at trial.

80.     Plaintiff has performed all duties and obligations on his part to be performed herein, except as performance thereof has been excused by the acts, conduct and/or omissions of Main Line.

81.     Main Line's wanton, willful and outrageous misconduct warrants punitive damages.

82.     As a further result, all property (including the Parcel) that is acquired or has been acquired by Main Line must be held in trust for Burris-Main Line Fiduciary Venture, and Main Line cannot usurp any such property for its own benefit to the exclusion of the Plaintiff.

### COUNT II
### (AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AND TORTIOUS CONDUCT)

### PLAINTIFF v. SEMINARY

83.     Plaintiff incorporates by reference each of the foregoing Paragraphs of this Complaint as though fully set forth at length herein.

84.     As set forth above, Main Line owed fiduciary duties to Plaintiff, which it breached through its conduct set forth above by, *inter alia*, engaging in secret negotiations for the Parcel, using the valuable and proprietary Burris Work, Burris' unique and proprietary business model, business plans, financial projections, pro-formas, due diligence, technical construction drawings, traffic studies, methods, know-how, plans and specifications, strategy, goodwill, preparation and information of Plaintiff, as well as Main Line's knowledge of the negotiations for the purchase of the Parcel between Seminary and the Burris-Main Line Fiduciary Venture, all for its sole benefit and to the detriment of its co-venturer/partner Plaintiff, then making a secret offer for the

acquisition of the Parcel, and entering into an agreement for the purchase of the Parcel without Plaintiff's involvement.

85.     At all times material, Seminary had knowledge of the Burris-Main Line Fiduciary Venture, knowledge of the fiduciary duties owed by Main Line to Plaintiff, and knowledge of the relationship between Plaintiff and Main Line as co-promoters for the acquisition of the Parcel.

86.     By engaging in secret negotiations with Main Line, by advising Main Line that it would accept an unconditional offer from Main Line without Plaintiff's involvement outside of the Burris-Main Line Fiduciary Venture and without Plaintiff's knowledge of these discussions and offers, and by accepting Main Line's secret unconditional offer to acquire the Parcel outside of the Burris-Main Line Fiduciary Venture, among other things, Seminary rendered substantial assistance and/or encouragement to Main Line in effecting its breach and usurpation of assets and opportunities belonging to the Burris-Main Line Fiduciary Venture.

87.     Seminary's conduct set forth above has harmed the Plaintiff and the Burris-Main Line Fiduciary Venture by robbing the Burris-Main Line Fiduciary Venture of the opportunity that it was formed to obtain, by robbing the Plaintiff of the benefit of the Burris-Main Line Fiduciary Venture, and by divesting Plaintiff of the value and benefit of the proprietary Burris Work, skill, know-how, business models, business plans, preparation, and resources invested by Plaintiff in the Burris-Main Line Fiduciary Venture.

88.     As a result of the conduct set forth above, the aiding and abetting Main Line's breach of its fiduciary relationship and the diversion of the opportunity belonging

to the Burris-Main Line Fiduciary Venture, the Seminary is required to sell the Parcel to Main Line in trust for the Plaintiff and the Burris-Main Line Fiduciary Venture.

89.     In addition, Plaintiff and the Burris-Main Line Fiduciary Venture have suffered damages, as a result of the conduct set forth above, and through the intentional interference with the prospective business relationships, in an amount to be proven at trial.

90.     Seminary's wanton, willful and outrageous misconduct warrants punitive damages.

**COUNT III**
**(TORTIOUS INTERFERENCE WITH PROSPECTIVE**
**CONTRACTUAL RELATIONS)**

**PLAINTIFF v. MAIN LINE**

91.     Plaintiff incorporates by reference each of the foregoing Paragraphs of this Complaint as though fully set forth at length herein.

92.     As set forth above, through Plaintiff's negotiations, Plaintiff had a prospective contractual relation with Seminary for the acquisition of the Parcel to construct, operate and develop Post-acute Care Centers on the Parcel in a partnership/joint venture/confidential relationship.

93.     Through its conduct set forth above, and using the information provided by Burris as part of the confidential relationship, Main Line acted with the purpose and/or intent to harm Plaintiff by preventing the relation from occurring.

94.     Main Line's conduct is without privilege or justification.

95.     Main Line's conduct and usurpation of the opportunity belonging to the Burris-Main Line Fiduciary Venture and Plaintiff, using *inter alia* the valuable and

proprietary Burris Work, Burris' unique and proprietary business model, business plans, financial projections, pro-formas, due diligence, technical construction drawings, traffic studies, methods, know-how, plans and specifications, strategy, goodwill, preparation and information relating to prior negotiations to benefit Main Line at the expense of Plaintiff, has harmed the Plaintiff and the Burris-Main Line Fiduciary Venture by robbing the Burris-Main Line Fiduciary Venture of the opportunity that it was formed to obtain, by robbing the Plaintiff of the benefit of the Burris-Main Line Fiduciary Venture, and by converting and using for its own purposes all of the valuable and proprietary Burris Work, skill, know-how, business models, business plans, preparation and resources invested by Plaintiff in the Burris-Main Line Fiduciary Venture.

96.    As a result of the conduct set forth above and the diversion of the opportunity belonging to the Burris-Main Line Fiduciary Venture, Plaintiff and the Burris-Main Line Fiduciary Venture have suffered damages in an amount to be proven at trial.

97.    Main Line's wanton, willful and outrageous misconduct warrants punitive damages.

## COUNT IV
## (USURPATION OF CORPORATE OPPORTUNITIES)

### PLAINTIFF v. MAIN LINE

98.    Plaintiff incorporates by reference each of the foregoing Paragraphs of this Complaint as though fully set forth at length herein.

99.    As set forth above, Plaintiff and Main Line were co-promoters of the enterprise formed between them, the Burris-Main Line Fiduciary Venture, for purposes of acquiring the Parcel to construct, develop and operate Post-acute Care Centers on the

Parcel, they formed a joint venture/partnership/confidential relationship thereby, and Main Line received confidential and proprietary information provided by Plaintiff to further the interests of the enterprise and partnership/joint venture/confidential relationship.

100.    As business partners, co-promoters and co-venturers/partners and/or parties in a confidential relationship, Main Line owed to Plaintiff a duty not to engage in any acts that would usurp the opportunities that rightfully belonged to the Burris-Main Line Fiduciary Venture and to Plaintiff, and not to usurp business opportunities that were developed through the investment of Plaintiff in the Burris-Main Line Fiduciary Venture, such as the acquisition of the Parcel.

101.    Notwithstanding, Main Line engaged in surreptitious negotiations and discussions with Seminary, and used its knowledge of the negotiations that Plaintiff were having with Seminary to obtain the opportunity to make a secret offer to Seminary for the acquisition of the Parcel without Plaintiff's involvement, which was accepted by Seminary, such that an agreement for Main Line to acquire the Parcel was made.  This opportunity usurped by Main Line was the very opportunity that Plaintiff had pursued for several years, and was the purpose of the co-promotion between Plaintiff and Main Line, and the formation of the Burris-Main Line Fiduciary Venture.

102.    Had this conduct not occurred, there was a reasonable expectancy that the offer made by Plaintiff on behalf of the Burris-Main Line Fiduciary Venture would have been accepted, and Plaintiff and the Burris-Main Line Fiduciary Venture would have been financially able to consummate the acquisition of the Parcel.

463847_1

103.    Through its usurpation of the opportunity to acquire the Parcel without Plaintiff's involvement, as well as Main Line's use of *inter alia* the valuable and proprietary Burris Work, Burris' unique and proprietary business model, business plans, financial projections, pro-formas, due diligence, technical construction drawings, traffic studies, methods, know-how, plans and specifications, strategy, goodwill, preparation and information relating to prior negotiations to benefit Main Line at the expense of Plaintiff, Main Line has diverted the opportunity to acquire the Parcel rightfully belonging to the Plaintiff and to Burris-Main Line Fiduciary Venture, to benefit Main Line's own self-interest at the expense of Plaintiff.

104.    Main Line's conduct and usurpation of the opportunity belonging to the Burris-Main Line Fiduciary Venture and Plaintiff, using *inter alia* the valuable and proprietary Burris Work, Burris' unique and proprietary business model, business plans, financial projections, pro-formas, due diligence, technical construction drawings, traffic studies, methods, know-how, plans and specifications, strategy, goodwill, preparation and information relating to prior negotiations to benefit Main Line at the expense of Plaintiff, has harmed the Plaintiff and the Burris-Main Line Fiduciary Venture by robbing the Burris-Main Line Fiduciary Venture of the opportunity that it was formed to obtain, by robbing the Plaintiff of the benefit of the Burris-Main Line Fiduciary Venture, and by converting and using for its own purposes all of the valuable and proprietary Burris Work, skill, know-how, business models, business plans, preparation and resources invested by Plaintiff in the Burris-Main Line Fiduciary Venture.

105.    As a result of the conduct set forth above and the diversion of the opportunity belonging to the Burris-Main Line Fiduciary Venture, Plaintiff and the

Burris-Main Line Fiduciary Venture have suffered damages in an amount to be proven at trial.

106.    Main Line's wanton, willful and outrageous misconduct warrants punitive damages.

## COUNT V
## (CONVERSION)

### PLAINTIFF v. MAIN LINE

107.    Plaintiff incorporates by reference each of the foregoing Paragraphs of this Complaint as though fully set forth at length herein.

108.    As set forth herein, Main Line has wrongfully exercised dominion and control over property owned by Plaintiff, including the valuable and proprietary Burris Work, Burris' unique and proprietary business model, business plans, financial projections, pro-formas, due diligence, technical construction drawings, traffic studies, methods, know-how, pricing formulas, plans and specifications, strategy, goodwill, preparation and information relating to prior negotiations to benefit Main Line, in a manner that is inconsistent with the rights of Plaintiff.

109.    Main Line has misappropriated the valuable and proprietary Burris Work, Burris' unique and proprietary business model, business plans, financial projections, pro-formas, due diligence, technical construction drawings, traffic studies, methods, know-how, plans and specifications, strategy, goodwill, pricing formulas, preparation and information relating to prior negotiations to benefit Main Line, which was provided to Main Line in reliance on the Burris-Main Line Fiduciary Venture that was formed, for Main Line's own individual benefit.

463847_1

110.    Main Line has misused the valuable and proprietary Burris Work, Burris'

unique and proprietary business model, business plans, financial projections, pro-formas,

due diligence, technical construction drawings, traffic studies, methods, know-how, plans

and specifications, strategy, goodwill, preparation and information relating to prior

negotiations to benefit Main Line, to compete with Plaintiff, tortiously interfere with

Plaintiff's prospective contractual relations, and usurp Plaintiff's corporate opportunities.

111.    As a direct and proximate result of Main Line's conduct, Plaintiff has

suffered, and will continue to suffer, severe harm.

112.    Main Line's wanton, willful and outrageous misconduct warrants punitive

damages.

**COUNT VI**
**(UNFAIR COMPETITION – COMMERCIAL RELATIONS)**

**PLAINTIFF v. MAIN LINE**

113.    Plaintiff incorporates by reference each of the foregoing Paragraphs of this

Complaint as though fully set forth at length herein.

114.    Main Line and Plaintiff operate businesses that compete with each other.

115.    Main Line's conduct as set forth above by, *inter alia*, becoming a co-

promoter with a competitor, Plaintiff, for the acquisition of the Parcel, entering into a

joint venture/partnership/confidential relationship with Plaintiff pursuant to which Main

Line received *inter alia* the valuable and proprietary Burris Work, Burris' unique and

proprietary business model, business plans, financial projections, pro-formas, due

diligence, technical construction drawings, traffic studies, methods, know-how, plans and

specifications, strategy, goodwill, preparation and information relating to prior

negotiations, all of which was competitively sensitive, only to turn around and

wrongfully use the competitively sensitive information provided by Plaintiff to divert the opportunity to acquire the Parcel to Main Line, excluding Plaintiff, constitutes an unlawful interference with commercial relations, unfair competition. and the misappropriation of trade secrets.

116.    As a direct and proximate result of Main Line's conduct, Plaintiff has suffered, and will continue to suffer, severe harm.

117.    Main Line's wanton, willful and outrageous misconduct warrants punitive damages.

**COUNT VII**
**(UNJUST ENRICHMENT)**

**PLAINTIFF v. MAIN LINE**

118.    Plaintiff incorporates by reference each of the foregoing Paragraphs of this Complaint as though fully set forth at length herein.

119.    As set forth above, through the co-promotion of the enterprise, and the formation of a joint venture/partnership/confidential relationship to acquire the Parcel, Plaintiff conferred on Main Line valuable benefits including but not limited to the valuable and proprietary Burris Work, Burris' unique and proprietary business model, business plans, financial projections, pro-formas, due diligence, technical construction drawings, traffic studies, methods, know-how, plans and specifications, strategy, goodwill, preparation and information relating to prior negotiations, which were to be used in furtherance of the co-promotion and the Burris-Main Line Fiduciary Venture.

120.    Main Line appreciated such benefits, only to turn around and use those benefits to engage in secret negotiations with Seminary to acquire the Parcel without

Plaintiff's involvement, such that it can now use all of those benefits for its own acquisition and use of the Parcel.

121.    Under these circumstances, as more fully set forth in this Complaint, acceptance and retention of the benefits described herein by Main Line would be inequitable, unconscionable and unjust without payment of value to Plaintiff.

## COUNT VIII
## (CIVIL CONSPIRACY)

### PLAINTIFF v. ALL DEFENDANTS

122.    Plaintiff incorporates by reference each of the foregoing Paragraphs of this Complaint as though fully set forth at length herein.

123.    As set forth above, Main Line and Seminary, through their respective agents and employees, combined with an agreed-upon malicious intent to effectuate the breaches of fiduciary duty, interference with prospective relations, conversion and usurpation of corporate opportunities, and other tortious conduct set forth above, by *inter alia* engaging in secret negotiations for the sale of the Parcel to Main Line, engaging in secret discussions with each entity's Board of Directors, and ultimately agreeing to sell the Parcel to Main Line, excluding Main Line's co-promoter and co-venturer/partner/confidential relationship, Plaintiff.

124.    The conspiracy and tortious conduct was and is without privilege or justification.

125.    Several overt acts were done in pursuance of the common purpose or design, as set forth above.

126.    As a direct and proximate result of Main Line's conduct, Plaintiff has suffered, and will continue to suffer, severe harm.

463847_1

127.     Main Line's wanton, willful and outrageous misconduct warrants punitive damages.

## COUNT IX
## (CONSTRUCTIVE TRUST AND PERMANENT INJUNCTIVE RELIEF)

### PLAINTIFF v. DEFENDANTS

128.     Plaintiff incorporates by reference each of the foregoing Paragraphs of this Complaint as though fully set forth at length herein.

129.     As noted above, after joining with Plaintiff as a co-promoter, and forming a joint venture/partnership/confidential relationship to pursue the acquisition of the Parcel, giving rise to fiduciary duties of *inter alia* loyalty, truthfulness, full disclosure, which duties preclude *inter alia* self-dealing and usurpation of corporate opportunities, Main Line breached all of those duties by going behind Plaintiff's back to secretly negotiate with Seminary, with the approval of Main Line's own Board of Directors, and then (upon information and belief, based upon the statements of principals for Seminary and Main Line) to enter into an agreement of sale to acquire the Parcel from Seminary.

130.     To the extent such an agreement of sale (as represented by Defendants' principals) exists, whether oral or written Main Line is required under the law to acquire the parcel for the Burris-Main Line Fiduciary Venture, and to hold the Parcel it purchases as a trustee, and all benefits derived therefrom without the consent of Plaintiff, in trust for Plaintiff and the Burris-Main Line Fiduciary Venture.

131.     Further, the law is clear that due to Main Line's abuse of its confidential relationship with Plaintiff, Main Line is under an equitable duty to convey the Parcel to Plaintiff and to Burris-Main Line Fiduciary Venture to avoid unjust enrichment due to, inter alia, Main Line's abuse of its confidential relationship.

132.     In addition, Main Line has usurped a benefit properly belonging to the

Burris-Main Line Fiduciary Venture, and this Court should impose a constructive trust

holding that the Parcel acquired by Main Line shall be held in trust, such that Plaintiff

shall be put as nearly as possible in the same position Plaintiff would have occupied if

there had been no wrongdoing by Main Line.

133.     By reason of the foregoing, both the law and equity require that an order

be issued creating a constructive trust be imposed upon the Parcel, whether it is in

possession of the Seminary, or in the possession, or constructive possession, of Main

Line, for the benefit of Plaintiff.

## COUNT IX
## (PERMANENT INJUNCTION)

### PLAINTIFF v. ALL DEFENDANTS

134.     Plaintiff incorporates by reference each of the foregoing Paragraphs of this

Complaint as though fully set forth at length herein.

135.     As noted above, after joining with Plaintiff as a co-promoter, and forming

a joint venture/partnership/confidential relationship to pursue the acquisition of the

Parcel, giving rise to fiduciary duties of *inter alia* loyalty, truthfulness, full disclosure,

which duties preclude *inter alia* self-dealing and usurpation of corporate opportunities, all

with the aid of and in conspiracy with Seminary, Main Line breached all of those duties

by going behind Plaintiff's back to secretly negotiate with Seminary, and make an offer

of sale to acquire the Parcel without Plaintiff's involvement.  All of which arose from the

conspiracy of between Main Line and Seminary.

136.     To the extent that an enforceable agreement of sale has not been agreed-

upon by Main Line and Seminary, the law is clear that Main Line cannot consummate

any acquisition of the Parcel in violation of its fiduciary obligations to the Plaintiff. Accordingly, Plaintiff's right to relief is clear, and this Court should enter a narrowly-tailored preliminary injunction precluding Main Line, and/or any parent, subsidiary, affiliated or related entities of Main Line, as well their representatives, successors, agents and assigns (collectively "Main Line Entities"), as well as those acting by, through or in concert with Main Line Entities, of the Plaintiff's claims in the above-entitled action, from acquiring any interest in the Parcel without the consent and involvement of the Plaintiff.

137.    In the absence of a preliminary injunction, Plaintiff will sustain irreparable harm which cannot be compensated with money damages.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff William Burris respectfully demands judgment in his favor and against Defendants Main Line Health System and Saint Charles Borromeo Roman Catholic Seminary, as follows:

(a)    If an enforceable agreement for the sale of the Parcel exists, whether written or oral, for the imposition of a constructive trust requiring the Parcel to be acquired by Main Line or any Main Line Entity, and to be held in trust for the Plaintiff and their partnership/joint venture/confidential relationship with Main Line; and to order the Defendants and those acting in concert with them to take all steps necessary to consent to and facilitate the purchase and development of the Parcel as envisioned in the October 2014 presentation approved by the Defendants to "retain the existing seminary building, including the chapel, and redevelop it with 166 senior living units and some office space, build a 90,000 square foot 124 private room Post-acute Care facility [to be operated by Main Line Health], and a 21,000 square foot Urgent Care Facility and a 104 unit Assisted Living Facility;

(b)    Or, in the alternative, for a permanent injunction precluding Defendant Main Line Health System, or any Main Line Entity, as well as those acting by, through or in concert with the Main Line Entities or any

of them, from acquiring any ownership interest in land owned by Defendant Saint Charles Borromeo Roman Catholic Seminary;

(c)    For incidental consequential and consequential damages;

(d)    For punitive damages;

(e)    For attorney's fees, expenses and costs of suit; and

(f)    For such other and further relief as this Court deems just, necessary and proper.

## <u>NOTICE OF PRESERVATION OF EVIDENCE</u>

PLAINTIFF HEREBY DEMANDS AND REQUESTS THAT DEFENDANTS TAKE ALL NECESSARY ACTION TO ENSURE THE PRESERVATION OF ALL DOCUMENTS, COMMUNICATIONS, AND DISCOVERABLE MATERIALS, INCLUDING ALL MARKETING AND SOLICITATION MEMBERSHIP MATERIALS, NOTICES AND COMMUNICATIONS WITH BANKS AND FINANCIAL INSTUTIONS, AND COMMUNICATIONS WITH THIRD PARTIES, WHETHER ELECTRONIC OR OTHERWISE, ITEMS AND THINGS IN THE POSSESSION OR CONTROL OF ANY PARTY TO THIS ACTION, OR ANY ENTITY OVER WHICH ANY PARTY TO THIS ACTION HAS CONTROL, OR FROM WHOM ANY PARTY TO THIS ACTION HAS ACCESS TO, ANY

DOCUMENTS, ITEMS, OR THINGS WHICH MAY IN ANY MANNER BE

RELEVANT TO OR RELATE TO THE SUBJECT MATTER OF THE CAUSES OF

ACTION AND/OR THE ALLEGATIONS OF THIS COMPLAINT.

Respectfully submitted,

Paul R. Rosen, Esquire
Andrew J. DeFalco, Esquire
**SPECTOR GADON & ROSEN, P.C.**
1635 Market Street, 7th Floor
Philadelphia, Pennsylvania  19103
(215) 241-8888 (Main)
(215) 241-8844 (Fax)
Counsel for Plaintiff

Date:  February 3, 2016

463847_1

EXHIBIT 1



**St. Charles Seminary**

**Buyer Qualification Questionnaire**

Please answer the following questions pertaining to the deal structure, sources of debt and equity, and underwriting assumptions.

# ENTITY/OWNERSHIP

1)      Please describe your entity structure as it relates to the acquisition.

The acquisition will include 7 limited liability companies with one being the holding company and the other 6 being the real estate and operating companies for the Post Acute Rehabilitation center, the Assisted Living Community and the Independent Living Community/Medical Office Building.

2)      What decision maker(s) from your organization and equity source(s) have visited the Property?  Who else will need to visit the Property prior to your commitment to purchase?

William G. Burris, Jr., William G. Burris, III and Kevin Breslin have visited the property on a number of occasions and no other property visits will be required prior to our commitment to purchase.

3)      Please provide transactional references, including contact name and phone numbers of any seller(s) or lender(s) involved in your last 3 acquisitions.

        i. Purchase of Mater Dei Nursing Home (176 Harding Highway (Route 40), Newfield, NJ, identified as Block 5 Lot 38, Township of Upper Pittsgrove, County of Salem, NJ).

St. Charles Seminary
Buyer Qualification Questionnaire

Page | 2

Cash Purchase of Nursing Home Real Property and Long Term Care Nursing License and Long Term Care Beds, as follows:
Purchase of Nursing Home by Burris Post Acute Network Piscataway, L.L.C. from Catholic Charities, Diocese of Camden, Inc.
Purchase of Long Term Care Nursing License and Long Term Care Beds by 467 Cooper St. Operating Company, L.L.C. from The Mater Dei Nursing Home, Newfield, New Jersey.

Agreement for Conveyance dated 11/12/12.

Obtain Subdivision Approval from Upper Pittsgrove Township Land Use Board for 11- acre portion of existing 68.48 acre Diocese Tract, for purposes of conveyance of the Mater Dei Nursing Home.  Said Subdivision Approval granted 6/20/13.

Transaction Closing Date 7/31/14. Cash Purchase.

Contacts:

Martin B. Idler, Executive Director Division of Health Services, Diocese of Camden 1845 Haddon Avenue, Camden, NJ 08103
856-342-4131 Phone
*(on behalf of Seller)*

Francis J. Monari, Esquire I McKernan, McKernan & Godino
113 North Sixth Street, Camden, New Jersey 08102-1269
856-964-7759 Phone
*(Seller's Attorney)*

Robert J. Fogg, Esquire I Archer & Greiner, P.C.
101 Carnegie Center, Suite 300, Princeton, NJ 08540
Direct Dial: 609-580-3702
*(Purchaser's Health Care Attorney)*

Stacie Jones, President I Infinity Title Agency
2026A Briggs Road, Mt. Laurel, NJ 08054
856-727-0818 ext. 111 Phone
*(Closing Agent)*

John M. Pettit, PE, PP, CME I The Pettit Group, LLC 497 Center Street, Sewell, NJ 08080
(856) 464-9600 Phone
*(Purchaser's Site Engineer/ prepared Subdivision Plan approved for purposes of conveyance from larger Diocese Tract)*

St. Charles Seminary
Buyer Qualification Questionnaire

Page | 3

    ii. <u>Redevelopment and Purchase of former Woodbury Country Club Tract (467 Cooper Street, identified as Block 154, Lot 8, City of Woodbury, Gloucester County, NJ).</u>

Designated Redeveloper and Purchaser of former Woodbury Country Club Property Tract for a proposed Health Care Campus, as follows:
Purchase by Burris Post Acute Network Woodbury, L.L.C. from PB Woodbury CC, LLC (Parke Bank).

Agreement of Purchase and Sale dated 4/8/13.

Coordination with Woodbury Township Council and Woodbury Land Use Board for the Rezoning of the Property and Creation of Redevelopment Plan Tailored to Zoning and Dimension Requirements for a Proposed Healthcare Campus, to include a Post-Acute Skilled Nursing Facility, an Assisted Living Facility, and a Memory Care Facility.
Redevelopment Plan adopted 8/13/13.

Transaction Closing Date 6/16/14.

Contacts:

Vito S. Pantilione, President, CEO I Parke Bank
Ralph Gallo, Vice President I Parke Bank
Chuck Pennoni, Chairman I Parke Bank Parke Bank
601 Delsea Drive, Sewell, New Jersey 08080
*(on behalf of Seller)*

William Volk, Mayor
William Fleming, City Council President
Louis Capelli, Jr., City Attorney
City of Woodbury
33 Delaware Street, Woodbury, NJ 08096
856-845-1300 Phone
*(on behalf of City of Woodbury)*

Douglas M. Joyce, Esquire / Cahill, Wilinski, Rhodes & Joyce, P.C.
89 N. Haddon Avenue, Suite A, Haddonfield, NJ 08033
Direct: 856-428-3927
*(Seller's Attorney)*

St. Charles Seminary
Buyer Qualification Questionnaire

Bud Amentt, Vice President Commercial Lending / Applied Bank
Louis J. Stackeni, Assistant Vice President Commercial Lending I Applied Bank Applied Bank
660 Plaza Drive, Newark, Delaware 19702
(302)326.4200 Phone
*(Lender)*

Dominic J. Balascio, Esquire I Parkway Law LLC
3171 Dupont Parkway, Suite B, Middletown, DE 19709
(302) 449-0400 Phone
*(Attorney for Lender, Applied Bank)*

Stacie Jones, President I Infinity Title Agency
2026A Briggs Road, Mt. Laurel, NJ 08054
856-727-0818 ext. 111 Phone
*(Closing Agent)*

John M. Pettit, PE, PP, CME I The Pettit Group, LLC
497 Center Street, Sewell, NJ 08080
(856) 464-9600 Phone
*(Purchaser's Site Engineer/ prepared Site Plan approved for purposes of Redevelopment of Property)*

     iii. <u>Purchase of HealthSouth Long Term Care Nursing License Rights and 37 Long Term Care Beds Rights.</u>

Purchase of Long Term Care Nursing License and 37 Long Term Care Beds Rights by Burris Post Acute Network Galloway, LLC/Health Resources of New Jersey, LLC from HealthSouth of Toms River, LLC/HealthSouth of Toms River II, LLC to be transferred from Toms River, Ocean County, NJ to Galloway Township, Atlantic County, NJ to accommodate the Post-Acute Skilled Nursing Facility project of Health Resources of New Jersey, LLC in Galloway Township.

Agreement dated 1/14/13.

Transaction Closing Date 10/14/13.

Contacts:

David Kostinas I David G. Kostinas & Associates
111 Madison Street, Newton, PA 18940
609-890-7286 Phone
*(Purchaser's Health Care Consultant)*

St. Charles Seminary
Buyer Qualification Questionnaire

Robert J. Fogg, Esquire I Archer & Greiner, P.C.
101 Carnegie Center, Suite 300, Princeton, NJ 08540
Direct Dial: 609-580-3702
*(Purchaser's Health Care Attorney)*

Barry Mandelbaum, Esq.
Donald Witmondt
Robert J. D'Anton Summit Capital, LLC
111 Magee Avenue
Lavallette, New Jersey 09735 742-854-9080 Phone
*(Lender )*

Craig Alexander, Esquire I Mandelbaum Salsburg
155 Prospect Avenue, West Orange, NJ 07052 973-736-4600 Phone
*(Attorney for Lender, Summit Capital, LLC)*

Mark J. Tarr, Executive Vice President, COO I HealthSouth of Toms River, LLC &
HealthSouth of Toms River II, LLC
HealthSouth Corporation
3660 Grandview Parkway, Suite 200
Birmingham, AL 35243
(205) 967-7116 Phone
*(on behalf of Seller)*

**4)      Please list your acquisitions over the last 6-12 months.  If any of the properties
detailed below were subject to a price adjustment after contract execution, please explain.
Ifany of the below acquisitions are debt- financed properties, please so note or indicate
"100% Equity".**

| Community Type/Units | Mater Dei<br>Skilled nursing center with 64 beds |
|---|---|
| Community Type/Units Explanations | Woodbury Country Club<br>Clubhouse, liquor license and 50 acres<br>Purchase of former country club for redevelopment as the Burris Post Acute Network Woodbury project. |
| Community Type/Units | HealthSouth<br>License and 37 skilled nursing beds |

St. Charles Seminary
Buyer Qualification Questionnaire

Explanations                    Purchase of license and beds for Burris Post Acute Network Galloway
                                project.

Included in 3) above are the acquisitions which have been completed. None of the properties
were subject to price adjustment after acquisition. All 3 acquisitions were debt-financed with
approximately 80% debt and 20% equity.

**5)       During the past 24 months, have you contracted to purchase any properties that did
not result in closing?   If yes, please explain.**

The following land contracts are pending as they are subject to obtaining the required local
approvals:

        i. Wayne / Purchase  of Property for development of 124 Private Bed Post-Acute Skilled
Nursing Facility adjacent  to St. Joseph's Wayne Hospital with proposed Teaching Partnership
with adjacent William Paterson University.

Agreement of Sale dated 1/30/12, by and between Purchaser, Health Resources of New Jersey,
LLC, and Seller, Vennik Trust, to purchase 438 Pompton Road (Block 2904, Lot 2), Wayne
Township, Passaic County, NJ. Purchaser proposes the development of a 124 Private Bed Post-
Acute Skilled Nursing Facility adjacent to St. Joseph's Wayne Hospital, as well as a proposed
teaching partnership with adjacent William Paterson University.

Purchaser obtained Use Variance Approval from the Wayne Zoning Board of Adjustment on
10/1/2012, and subsequently obtained Preliminary and Final Site Plan Approval from the
Wayne Zoning Board of Adjustment on 4/15/13.

Competitor/Objector Regency Gardens Nursing Home commenced litigation appealing the
Approvals granted by the Wayne Zoning Board of Adjustment and further appealing the
Certificate of Need granted by Commissioner of the New Jersey Department of Health.  The
New Jersey Superior Court rejected the Competitor/Objector's Appeal and upheld the Zoning
Board of Adjustment's Approval.  Competitor/Objector appealed to the Appellate Court where
both Appeals are currently pending.  Both Appeals have been briefed and we await decisions.

During the pendency of the Competitor/Objector Appeals, Purchaser is paying Seller bi-
monthly Approval Extension Fees (non-refundable but applicable to Purchase Price at Closing)
and Carrying Costs for the real property taxes until Closing.

St. Charles Seminary
Buyer Qualification Questionnaire

    ii. <u>Galloway / Purchase Property for development of 124 Private Bed Post-Acute Skilled Nursing Facility (designated as 23 E. Jimmie Leeds Road (Block 950.02, Lot 5) Galloway Township, Atlantic County, NJ).</u>

Agreement of Sale dated 8/31/12, by and between Purchaser, Health Resources of New Jersey, LLC, and Seller, Dublin Development Group, LLC, to purchase 23 E. Jimmie Leeds Road (Block 2904, Lot 2), Galloway Township, Atlantic County, NJ. Purchaser proposes the development of a 124 Private Bed Post-Acute Skilled Nursing Facility.

Purchaser obtained Conditional Use Approval, Preliminary and Final Site Plan Approval, and Minor Subdivision Approval from the Galloway Township Zoning Board of Adjustment on 11114/13.

Competitor/Objector Bacharach Institute for Rehabilitation, Inc. commenced litigation appealing the Approval granted by the Galloway Township Zoning Board of Adjustment. That Appeal is currently pending in the Atlantic County Superior
Court. The Appeal has been briefed, Honorable Judge Mendez heard oral arguments on 9/18/14, and we currently await the Court's decision.

During the pendency of the Competitor/Objector Appeal, Purchaser is paying Seller monthly Approval Extension Fees (non-refundable but applicable to Purchase Price at Closing) and Carrying Costs for the real property taxes until Closing.

    iii. <u>Toms River / Purchase Property for development of 124 Private Bed Post-Acute Skilled Nursing Facility (designated as 21 Smith Road (Block 535.08, Lot 35), Toms River Township, Ocean County, NJ).</u>

Agreement of Purchase and Sale dated 9/13/12, by and between Purchaser, Lapid Ventures, LLC, and Seller, Greater Community Hospital Associates, LLC, to purchase 21 Smith Road (Block 535.08, Lot 35), Toms River Township, Ocean County,
NJ. Purchaser proposes the development of a 124 Private Bed Post-Acute Skilled Nursing Facility.

Purchaser is seeking Use Variance and Preliminary and Final Site Plan Approval from the Toms River Zoning Board of Adjustment.  Competitor Rose Garden Nursing Home has hired counsel to object to the Application.  The first hearing before the Zoning Board of Adjustment was held on 10/24/13 with numerous hearings since and continuing to the next hearing date currently scheduled for 12111114.  The Competitor/Objector has indicated its plans to appeal any Approval granted by the Zoning Board of Adjustment.

St. Charles Seminary
Buyer Qualification Questionnaire

During the pendency of the protracted hearings and any future Appeal, Purchase is paying Seller monthly Approval Extension Fees (non-refundable but one-half of each Extension Fee Payment applicable to Purchase Price at Closing) and Carrying Costs for the real property taxes until Closing.

    iv. Livingston / Purchase of Property, Subdivision, Rezoning of Property and Hospital Campus, and Land Swap with St. Barnabas Medical Center for Development to include a 1 24 Private Bed Post-Acute Skilled Nursing Facility, Hospital Parking, and Assisted Living Facility (designated as Old Short Hills Road (Block 7300, Lot 4.01, Lot 4.02, Lot 5, and Proposed New Lot 4.03), Livingston Township, Essex County, NJ).

This is a Complex Transaction that involves various Rezonings, Re-Subdivision to create a New Lot, Land Swap with the Hospital, and involves 4 Separate Contracts with 3 Separate Entities, as follows:

•       Agreement of Sale dated 8/2/12, by and between Purchaser, Health Resources of New Jersey, LLC, and Seller, East Cedar Street, LLC, to purchase Block 7300, Lot 4.01, Livingston Township, NJ, to be developed for Hospital Parking.

•       Agreement dated 8/28/12, by and between Purchaser, Health Resources of New Jersey, LLC, and Seller, Short Hills West, Ltd., to purchase Block 7300, Lot 4.02, Livingston Township, NJ, to be developed as an Assisted Living Facility.

•       Purchase and Sale Agreement dated 11/27/13, by and between Purchaser, Health Resources of New Jersey, LLC, and Seller, St. Barnabas Medical Center, to purchase portion of Block 7300, Lot 5, Livingston Township, NJ, and to be merged with a portion of existing Block 7300, Lot 4.01 (by a Subdivision.

        Application) to create a New Lot 4.0-3 to be developed as a Post-Acute     Skilled Nursing Facility.

•       Purchase and Sale Agreement dated 11/27/13, by and between Purchaser, St. Barnabas Medical Center, and Seller, Health Resources of New Jersey, LLC, to purchase Block 7300, Lot 4.01, Livingston Township, NJ, to be developed for Hospital Parking (Land Swap).

Coordination with the Livingston Township Council and Livingston Township Planning Board to Rezone the Hospital Campus by establishing the HH Hospital Healthcare District and to Revise the R-5D District Zoning Requirements applicable to the Property to accommodate the proposed Post-Acute Skilled Nursing Facility, an Assisted Living Facility, and Hospital Parking in connection with the Hospital's proposed expansion project.
Hospital Campus rezoned by the Township Council to HH Hospital Healthcare District by Ordinance 22-2013 adopted on 8/19/13.

St. Charles Seminary
Buyer Qualification Questionnaire

Page | 9

Purchaser obtained Subdivision Approval on 6/3/14 from the Livingston Township Planning Board to merge a portion of Block 7300, Lot 4.01 with a portion of Block 7300, Lot 5 to create New Lot 4.03 to be developed as a Post-Acute Skilled Nursing Facility.  Additionally, coordinate with Livingston Township Council to Rezone New Lot 4.03 into the HH Hospital Healthcare District by Ordinance adopted on 4/28/14 to accommodate the Post-Acute Skilled Nursing Facility as a permitted use.

Purchaser obtained Preliminary and Final Site Plan Approvals/Minor Subdivision Approval for all development on 10/7/14; Resolutions memorializing the Approvals granted are scheduled to adopted 11/4/14 by the Livingston Township Planning Board.

Competitor/Objector Inglemoor Rehabilitation and Care Center has hired counsel and objected at the very last hearing held on I0/7/14.  The Competitor/Objector has indicated an intent to appeal the Approvals granted by the Planning Board.

Applications are pending with the Essex County Planning Board and with the Soil Conservation District.  Upon receipt of those approvals, and assuming no Appeal is filed by Competitor/Objector  Inglemoor Rehabilitation and Care Center, the Site Plan and Minor Subdivision Approvals granted by the Livingston Township Planning Board may be perfected.

6)    Describe your current portfolio, # of units currently owned, and indicate where they are located.

Our current portfolio consists of a combination of skilled nursing and assisted living with 1,184 beds on 5 campuses throughout in Matawan, New Jersey, Park Ridge, New Jersey, Princeton, New Jersey and Wayne, New Jersey.

## FINANCIAL

7)    Recognizing the value of a commitment to non-refundable deposit(s) as early as possible, please outline your deposit structure.  Indicate milestone(s) for each deposit and, for each:
a)    If the deposit is deemed non-refundable.
b)    If the deposit is to be released to the Seller.
c)    If the deposit is in addition to or on account of either
    i.   The upfront payment, if any
    ii.  The land lease payment

St. Charles Seminary
Buyer Qualification Questionnaire

Page | 10

Deposit #1 - $1,000,000 -nonrefundable upon execution of definitive agreements and
expiration of any due diligence periods.
Deposit #2 - $3,000,000 -nonrefundable upon receipt of certificate of occupancy for Post Acute
Rehabilitation center.
Deposit #3 - $3,000,000 -nonrefundable upon receipt of certificate of occupancy for Assisted
Living Community.
Deposit #4 - $3,000,000 - nonrefundable upon receipt of certificate of occupancy for
Independent Living Community.

8)      Indicate your upfront payment at closing.

$1,000,000 upon execution of definitive agreements.

9)      Indicate your annual lease payment and commencement date of payments.  Include
escalation(s).

Lease payments are as follows:
$500,000 for Post Acute Rehabilitation center
$300,000 for Assisted Living Community
$1,900,000 for Independent Living Community/Medical Office Building
Lease payments shall begin upon receipt of certificate of occupancy for each.  Lease payments
shall increase on the anniversary of the lease commencement by 2% per year.

10)      Please supply a sources & uses statement of all funds for the acquisition.  Are these
discretionary funds? Please be specific as to the amounts or percentages of equity from each
source and whether or not it is readily available and approved.

See attached sources and uses.  The uses for land and a portion of the ILF building are
developed based upon the estimated value of the lease payment and the deposit.  The equity
required will be funds through existing cash as well as equity from one of our investment
groups.

11)      Please outline your underwriting assumptions or provide a copy of your Fiscal Year
One Pro Forma.

Will be provided upon completion of a confidentiality agreement.

## MISCELLANEOUS

PLEASE SEE ATTACHED ADDENDUM

St. Charles Seminary
Buyer Qualification Questionnaire

Page | 11

**12)   How many days do you need to execute the Agreement of Sale?  Which law firm would represent you?**

60 days to execute the definitive agreements.  McDermott, Will and Emery will likely be the law firm which will represent us in this transaction.

**13)   Briefly describe your due diligence process.  Identify potential pitfalls to be addressed during this period.**

Aside from the standard real estate transaction due diligence, we will conduct a property condition report and environmental study.  Although we do not expect any concerns, it is possible that our due diligence will identify concerns relating to title, physical plant, environmental, etc.

We have for 19 months now examined the site and its features. Our professionals have completed their planning analysis, traffic study, and fiscal impact report. On balance, our application offers the least traffic impact, the best fiscal impact (result) to the community, and several inherently beneficial uses we expect will insure our project is approved by the community on merit. There is no further due diligence required to this aspect.

**14)   Who are your third party consultants?  Are your consultants ready to work on this project?**

Ross Weiss
Office Managing Partner
COZEN O'CONNOR
Suite 400
200 Four Falls Corporate Center, P.O. Box 800 West Conshohocken, PA 19428-0800
P: 610-941-2361

Bob Plucienik
President
Chester Valley Engineers, Inc.
83 Chestnut Road, P. O. Box 447,
Paoli, PA 19301
P: 610 644-4623 ext 111, F: 610 644-0680
rhp@Chesterv.com

St. Charles Seminary
Buyer Qualification Questionnaire

| 12

Kevin L. Johnson, P.E.
President
TRAFFIC PLANNING AND DESIGN, INC. (TPD)
2500 East High St., Suite 650
Pottstown, Pa. 19464
P: 610.326.3100


Thomas J. Comitta, AICP, CNU-A, RLA
President
THOMAS COMITTA ASSOCIATES, INC.
Town Planners & Landscape Architects
18 W. Chestnut Street
West Chester, PA  19380
610-696-3896 ext. 4
Cell:  484-678-9245

Lawrence R. Lesser, Esq.
FREIDMAN SCHUMANN
101 Greenwood Avenue,
5th Floor
Jenkintown PA 19046
215-690-3807

Stephen Cohen CPA Principle-
Chairman of the Board
MORRIS J. COHEN & CO. PC
1601 Market Street
Suite 2525
Philadelphia, PA 19103
Phone: (215) 567-8000

Roland Borglund, RA
BORGLUND ASSOCIATES, LLC
Architecture - Planning - Urban Design
880 Jupiter Park Drive
Suite 15, Jupiter, FL 33458
561.747.9234 ext 4

St. Charles Seminary
Buyer Qualification Questionnaire

Jeffrey F. Wells A.I.A
COASTAL DESIGN GROUP, LLC
510 North Bay Avenue
Beach Haven, NJ 08008
201-741-7550

Our consultants have been working on this project for a considerable amount of time. We are ready for the first application to the Township of Lower Merion, and have significant experience with projects in this community.

Our traffic experts are prepared to make their PennDot application, and our construction plans are nearly complete for the Post Acute Care Facility, and the Assisted Living Facility which are modification to our prototypes we have already done. Anything else required to be done at this point requires approval of the Seminary Board.

**15)    How many other deals are you currently working on? (Please identify the number of contracts and letters of intent that are under negotiation.)**

In question # 5 above, we have identified deals we are working on from a development standpoint and have others where confidentiality agreements exist. All explained below.

We recently negotiated an LOI for the acquisition of twenty two operating facilities in the MidWest, have a contract to acquire a company in New Jersey that owns six nursing centers and four assisted living centers that is pending HUD approval, and an LOI to lease/purchase a nursing center in the Princeton New Jersey market.

New Jersey is a CON state for nursing facilities. We have contracts to acquire three nursing home licenses and the related beds, and an installment agreement to acquire another license and beds. We are pursuing available land and partnerships with several hospitals to develop these licenses into Post Acute facilities.

Our new Post Acute facility will open on the campus of Robert Wood Johnson University Medical Center/Hamilton before the end of the year.

We are partners with a major health system in Northern New Jersey on an acquisition of a significant parcel of land where we will develop a healthcare village. The property acquisition exceeds one hundred million dollars.

Finally, we are negotiating the finer points of a partnership with Main Line health in our pursuit of the instant proposal.

St. Charles Seminary
Buyer Qualification Questionnaire

P a g e | 14

16)     Be specific as to the level of approvals you will be seeking from Lower Merion Township including, but not limited to, if any:

1.     Zoning change
2.     Special Use permission
3.     Designations such as historic, low income, etc.
4.     Requirements for unit (in terms of count and size)
5.     Requirements for parking under your intended plan

Zoning – the first step is to convince the Township staff, Planning Commissioners, Board of Commissioners and neighbors of the wisdom of the benefits of the proposed development and then to work on the zoning amendments to implement the comprehensive plan for the redevelopment of the property. Pending the initial meetings with staff our plan is to seek amendments of Article XXVI., the Open Space Preservation District, to have our proposed uses approvable by right.

a) Add a new subsection 155-142.E. "Encourage innovation and promote flexibility, economy and ingenuity in the development of large tracts for Health Care Campus Use, including subdivisions and land developments." (This flows from155-142.D.)

b) Modify subsection 155-143.B., by adding our health care Campus Use, so that it reads "All property within the district used or intended to be developed for residential and Health Care Campus Use shall comply with the provisions of this article".

c) Expand subsection 155-145., to add 155-145. A. (6) "Health Care Campus as an adaptive reuse of an existing Campus for Independent Living Units and /or Assisted Living Units, and as an expansion of an existing Campus for Post Acute Care and Rehabilitation, Assisted Living Units, Medical Offices, and outdoor or indoor Horticultural Therapy Gardens".

d) Expand subsection 155-146., development standards, to add new subsection 155-146. L. " Health Care Campus may have up to 125 Independent Living Units in an Adaptively Re-used campus building, up to 125 Assisted Living Units, up to 125 Post Acute Care and Rehabilitation rooms, and up to 25,000 square feet of Medical Offices".

e) Add a new subsection 155-146.M. "Health Care Campus buildings may have up to 125 units or rooms in each building, and the greatest dimension of a new structure shall not exceed 1200 feet, unless there are Nursing Stations in which case the greatest dimension in length or depth shall not exceed 1400 feet"

f) Apply to the zoning hearing board for a determination of the required number of parking spaces for the assisted lrving use per section 155-167.2.

St. Charles Seminary
Buyer Qualification Questionnaire

Page | 15

Traffic - We do not feel traffic is a pitfall although it is typically the subject that will attract the most attention especially from the neighbors. The proposed development is not anticipated to be traffic intensive and is less than other potential development scenarios for the site.. However, given our traffic consultant's (Traffic Planning and Design, Inc. - TPD) knowledge and experience in the area, we feel we are more than adequately prepared to address any potential traffic concerns.  TPD is intimately familiar with the site location and the Township. TPD worked with Main Line Health for the recent Lankenau Hospital expansion and were responsible for the traffic study and design of the roadway/signal improvement related to that project.  In addition, TPD has worked on many other projects within the Township, including the planned new Whole Foods store, the Ardmore YMCA redevelopment, Dranoff Properties' One Ardmore Place, the redevelopment of BMW of the Main Line, and the Bryn Mawr Hospital Expansion to name a few notable projects.

Approvals and Timing – we estimate that it will 6-12 months to have the amendments to the zoning code adopted and an additional 18- 24 months to obtain all approvals from the Township and outside agencies like PennDOT. Sometimes it is possible, to some extent, to overlap and run the zoning amendment process and the land development approvals concurrently.  Land development will include approvals of the sketch plan, conditional use and preliminary and final plans.

Closing – in addition to typical requirements of an agreement of sale we will need all approvals, with the expiration of all appeal periods with no appeals being filed, recordable plans and building permits prior to closing.

**17)**    Detail your interpretation of the zoning and land use ordinances you are referencing/contemplating in your answer to question 16 above.  Be specific as to how you arrive at your use, unit count, parking requirements, etc. as they each relate to the applicable ordinances.

See #16 above.

**18)**    What are your conditions precedent to closing?  How long do you expect them to take? Indicate your willingness to pick a "date certain" to proceed to closing with or without said conditions being met.

See #16 Above.

St. Charles Seminary
Buyer Qualification Questionnaire

## ADDENDUM TO BUYER QUALIFICATION QUESTIONNAIRE

Burris, in partnership with Main Line Health, proposes to retain the existing seminary building, including the chapel, and redevelop it with 116 senior living units and some office space, build a 90,000 square foot 124 private room Post Acute Care Facility, a 21,000 square foot Urgent Care Facility and a 104 unit Assisted Living Facility.

St. Charles Seminary
Buyer Qualification Questionnaire

Page | 17

Sources

| | PAR | ALF | ILF | Total |
|---|---|---|---|---|
| Bank Financing - TBD | 30,400,000 | 28,400,000 | 34,800,000 | 93,600,000 |
| Equity | 7,600,000 | 7,100,000 | 8,700,000 | 23,400,000 |
| Working Capital Loan | 2,000,000 | 500,000 | 500,000 | 3,000,000 |
| | 40,000,000 | 36,000,000 | 44,000,000 | 120,000,000 |
| Uses | - | - | - | - |
| Land | 10,666,667 | 7,000,000 | 9,666,667 | 27,333,334 |
| Building | 20,672,750 | 24,695,000 | 31,216,667 | 76,584,417 |
| Building Construction Contingency | - | - | - | - |
| Furniture & Fixtures | 2,550,000 | 1,142,080 | 1,142,080 | 4,834,160 |
| Construction Interest Capitalized | 1,300,000 | 1,300,000 | 500,000 | 3,100,000 |
| Other Startup Costs | 2,810,583 | 1,362,920 | 974,586 | 5,148,089 |
| License Costs | - | - | - | - |
| Working Capital Loan Availability | 2,000,000 | 500,000 | 500,000 | 3,000,000 |
| Total startup | 40,000,000 | 36,000,000 | 44,000,000 | 120,000,000 |
| Difference | - | - | - | - |