## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WILLIAM BURRIS,** | : | |
| *Plaintiff*, | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **MAIN LINE HEALTH SYSTEM et al.,** | : | **No. 16-543** |
| *Defendants*. | : | |

## <u>M E M O R A N D U M</u>

PRATTER, J.                                                                 JUNE 8, 2017

William Burris seeks equitable relief and damages for an array of claims arising out of Main Line Health System's ("Main Line" or "MLH") alleged abuse of a purported legal relationship with Mr. Burris and Main Line's alleged misuse of materials obtained during the course of that relationship in connection with the purchase of real property from Saint Charles Borromeo Roman Catholic Seminary ("St. Charles" or "the Seminary").  Mr. Burris also alleges, *inter alia*, that St. Charles aided and abetted Main Line's breach of fiduciary duty and is liable for civil conspiracy.

Main Line and St. Charles each moved for summary judgment shortly after the Complaint was filed, seeking to dismiss all of Mr. Burris's claims against them.  Because the Court concludes that the evidence in the record raises some genuine issues of material fact, summary judgment will be denied.

### FACTUAL AND PROCEDURAL HISTORY

Mr. Burris is the Chairman and Chief Executive Officer of various business entities involved in the development and operation of post-acute care facilities in the tri-state area, and

beginning in 2013, he sought to expand his network by acquiring a 40-acre parcel of land[1] (the "Parcel") located in Lower Marion Township, Pennsylvania and owned by St. Charles Seminary. Lankenau Hospital, which is is owned and operated by defendant Main Line, is located across the street from the Parcel. Burris Aff. ¶ 10. After reading an article published by the *Philadelphia Inquirer* reporting that the Archdiocese of Philadelphia was considering selling the Parcel, Mr. Burris contacted officials at St. Charles about acquiring it in order to open and operate a post-acute care facility. Burris Aff. ¶ 5.

The Seminary engaged a broker—Holliday Fenoglio Fowler, L.P. ("HFF")—to list the Parcel and manage the bidding process. Summary Judgment Record ("S.J.R."), at 1–4. Jeffrey Julien, the Managing Director at HFF, served as the point person for the Seminary. Mr. Burris submitted a first-round bid for the Parcel in December 2013 and a second-round bid in January 2014. S.J.R. 3–9; S.J.R. 17–18.[2] After he submitted his second-round bid, Mr. Burris engaged professionals to, among other things, draft "Renderings and Plans" and ensure his planned facility would comply with Township requirements. Burris Aff. ¶¶ 8–9. The Renderings and Plans describe possible improvements to the Parcel if Mr. Burris's bid was successful. S.J.R. 23–36; Burris Aff. ¶ 9.

## I. Burris and Main Line Discuss Involvement

In April 2014, members of St. Charles's Board of Directors encouraged Mr. Burris to meet with John "Jack" Lynch III, Main Line's President, due to Main Line's neighboring Lankenau Hospital. S.J.R. 38. At this recommendation, Mr. Burris contacted Mr. Lynch and the two began discussing possibilities for the Parcel. S.J.R. 11; Burris Aff. ¶ 12. In May 2014, Mr.

---

[1] The Seminary ground include an "upper" portion, consisting of 29 acres (which was not initially offered for sale), and the "lower" 40 acre portion, which is the portion primarily issue in this case. Burris Aff. ¶¶ 2–3.

[2] Evidently, submitting a bid through HFF's website generated a "Confidentiality and Conditions Offering Agreement" stating that HFF "represents Owner [the Seminary] as owner's exclusive agent or broker for the potential sale of the Property." S.J.R. 5-9.

Burris invited Mr. Lynch, Jo Ann Magnatta (Main Line's Senior Vice President of Facilities Design and Construction), Donna Phillips (President of Bryn Mawr Rehabilitation Hospital), and other Main Line executives on a tour of a post-acute care facility he owns in Moorestown, New Jersey. Burris Aff. ¶ 15.

According to Mr. Burris, Main Line executives were "blown away" by his New Jersey facility, and after the tour, Mr. Lynch told Mr. Burris "I want in," meaning, in Mr. Burris' estimation, that he wanted Main Line to join Mr. Burris in a partnership, joint venture, or as a co-developer of Burris's proposed facility. Burris Aff. ¶¶ 16–17. Mr. Burris emailed Mr. Julien at HFF, the Seminary's broker, following the tour and reported that "[t]he goal of the meeting was to solicit the support of Lankenau Hospital for our pursuit at St. Charles. Mr. Lynch advised after the tour and subsequent meeting that he would not simply endorse our project, he wants to be a part of it, and wants you to know that." S.J.R. 849.

Main Line took steps to explore developing the Parcel with Mr. Burris. Ms. Magnatta attended calls and meetings with Mr. Burris a few weeks after the tour, and Mr. Burris began disclosing information about and plans for the Parcel, including the Renderings and Plans he had commissioned. Burris Aff. ¶¶ 18-19; S.J.R. 13. In mid-June 2014, Mr. Lynch emailed Bishop Timothy Senior, Rector of the St. Charles Seminary, to show his support for and involvement in Mr. Burris's bid. He explained that while Main Line and Mr. Burris "ha[d] not reached formal agreement" yet, they were "in the process of developing a relationship that would include [Main Line's] participation in the operation of the facilities." S.J.R. 11. On June 27, 2014, Lydia Hammer, Main Line's Senior Vice President of Marketing and Business Development drafted and circulated a memorandum called "Options for MLH Burris Partnership at St. Charles Seminary," which outlined possible arrangements for a Burris-Main Line relationship. S.J.R. 42–

44. Throughout June and July 2014, Main Line executives attended meetings with Mr. Burris about the development, including one with a Lower Merion Township official to discuss various issues, including rezoning. S.J.R. 12; Burris Aff. ¶¶ 22–23.

Mr. Burris[3] and Mr. Lynch went back-and-forth about the proposed relationship between the parties and the manner in which responsibilities would be divided. Some communications indicate a co-ownership partnership, while others contemplate a management arrangement. On August 9, 2014, Mr. Burris sent Mr. Lynch an email attaching details for a planned facility at the Seminary called "MLH at Wynnewood," and alerting him that "[w]ithin the next week or so, [he would] put forth a proposal . . . for [Main Line's] operations to run the campus we are proposing in the context of a joint venture between the parties." S.J.R. 53–54. Mr. Burris sent a Letter of Intent ("LOI") outlining a joint venture to Main Line on August 22, 2014.[4] S.J.R. 55–58.

Negotiations continued throughout September and October 2014. Several emails among Main Line personnel during this time period show that Main Line was considering the ownership and management proposals provided by Mr. Burris and that its position was not set in stone. For example, an email from Lydia Hammer to Donna Phillips stated that Main Line was reluctant to pursue 50/50 ownership of the entire project, but remained open to partial ownership or management "joint venture" arrangements. S.J.R. 59. Main Line executives exchanged a draft response to Burris, stating that they were "not interested in Joint Venturing on the MOB,

---

[3] At some point in August of 2014, Burris Construction merged with Atrium Health & Senior Living. Doc. No. 21-10 at 19. Mr. Burris continued to act as the driving force behind negotiations with both Saint Charles and Main Line and all parties continued to refer to the entity represented by Mr. Burris as "Burris" or "Burris Construction."

[4] The August LOI proposed, in relevant part: (1) a "joint venture" between the parties—"the St. Charles Joint Venture," (2) 50/50 ownership by Main Line and Burris, and (3) an arrangement including 124 skilled nursing beds, 124 assisted living/Alzhemer's assisted living units, 124 independent living units and outpatient rehabilitation. S.J.R. 56–57. The LOI also included confidentiality and exclusivity provisions. S.J.R. 57–58. The record does not show that the LOI was returned, but Mr. Burris takes the position that Main Line accepted the August 2014 LOI in October 2014 when the parties were preparing materials to submit to the Seminary as part of the bidding process. *See* Pl. Br. 14 n.2.

Assisted Living and the Alzheimers unit[,] [and were] [i]nterested only in doing a joint venture on the SNF [skilled nursing facility] and managing the outpatient therapy and contracting [MLH] therapists for the SNF." S.J.R. 71. In Main Line's following communication with Mr. Burris, it affirmed its continued desire to discuss a joint venture, but clarified that its interest was limited to the skilled nursing facility. S.J.R. 118.

Meanwhile, both Mr. Burris and Mr. Lynch were in communication with the Seminary, either directly or through HFF, about the Parcel. On September 18, 2014, Mr. Lynch wrote that he had "a good conversation with Bishop Senior" and that "they [were] very pleased to hear that [Main Line] [was] involved in the Burris proposal." S.J.R. 74. On that same date, Mr. Burris wrote to Mr. Julien to report that he "h[ad] been actively working on the partnership with Main Line Health." *Id.* Mr. Burris continued to communicate with Mr. Julien at HFF and develop the project by, for example, instructing his architects to incorporate medical office space for Main Line and engaging in due diligence such as obtaining traffic analysis for the proposed project and speaking with Lower Merion officials. *Id.*

At the end of September, Donna Phillips from Main Line and Ken Keegan from the Burris Post-Acute Network executed a Non-Disclosure Agreement ("NDA") enabling each party to "share certain proprietary information" in discussions "regarding possible collaboration." S.J.R. 65. The NDA states that "[t]he Receiving Party agrees to use the Confidential Information solely in connection with the current or contemplated business relationship between the parties and not for any purpose other than as authorized by this Agreement." S.J.R. 66. Of particular relevance here, the NDA contained a section stating that it did not constitute an outside legal obligation:

> The parties agree that neither party will be under any legal obligation of any kind
> whatsoever with respect to a Transaction by virtue of this Agreement, except for

the matters specifically agreed to herein. The parties further acknowledge and agree that they each reserve the right, in their sole and absolute discretion, to reject any and all proposals and to terminate discussions and negotiations with respect to a Transaction at any time. This agreement does not create a joint venture or partnership between the parties. . . .

S.J.R. 67. Two other provisions are relevant here. First, the NDA contained an integration clause: "This agreement constitutes the entire understanding between the parties and supersedes any and all prior or contemporaneous understandings and agreements, whether oral or written, between the parties, with respect to the subject matter hereof." S.J.R. 67. Second, the NDA provides that "[t]he receipt of Confidential Information pursuant to this Agreement will not prevent or in any way limit either party from: (i) developing, making or marketing products or services that are or may be competitive with the products or services of the other; or (ii) providing products or services to others who compete with the other." S.J.R. 68. In light of this agreement, Mr. Burris disclosed plans for the Parcel and confidential information about his business operations to Main Line. S.J.R 69–70.

## II.     Submitting the Buyer Qualification Questionnaire to St. Charles

In October 2014, HFF requested that Burris and the other two final candidates[5] who placed bids on the Parcel submit a Buyer Qualification Questionnaire ("BQQ"). S.J.R. 82; S.J.R. 102-05. Mr. Burris, Mr. Lynch, and others such as Thomas Comitta Associates (town planners/landscape architects brought on by Mr. Burris) were involved in preparing the BQQ. S.J.R. 119–22. Before the BQQ was submitted, Mr. Lynch presented the opportunity to Main Line's Board of Directors, explaining that "MLH is interested in developing the [Seminary's] lower campus. . . . Burris Construction has offered to build a 124-bed skilled nursing facility and

<hr>

[5] As of the beginning of October 2014, HFF and the Seminary were considering final bids from Burris, Jefferson Group, and Cross Properties. Jefferson dropped out of the process, so the Seminary was considering only Burris and Cross Properties at that time. S.J.R. 139.

is interested in a 50/50 partnership with MLH." S.J.R. 138. On October 28, 2014, Mr. Burris circulated the final draft of the BQQ to Mr. Lynch and others. S.J.R. 140.[6]

The Burris team submitted the BQQ[7] to HFF on October 29, 2014 in advance of the final bid meeting scheduled that day. S.J.R. 159–76. The BQQ acknowledged that Burris was "negotiating the finer points of a partnership with Main Line." S.J.R. 172. However, it included the Addendum that had been circulated to Main Line explaining that Burris was acting "in partnership with Main Line Health" in order "to retain the existing seminary building, including the chapel, and redevelop it . . ." S.J.R. 175. Mr. Burris asserts that the business entities that would acquire the Parcel itself had not yet been created. Burris Aff. ¶ 40; S.J.R. 160. Mr. Burris and Mr. Lynch made a presentation to Bishop Senior and the St. Charles Seminary Board during which they each discussed proposed plans for the Parcel. Mr. Burris alleges in his affidavit that Mr. Lynch personally spoke during the joint presentation and voiced his approval of a partnership of some sort between the two entities. *See* Burris Aff. ¶¶ 42–43.

### III. Post-BQQ Negotiations Between Burris and Main Line

Discussion between personnel associated with Mr. Burris and Main Line on the structure of the alleged joint venture continued after the presentation to the Seminary Board.[8] Emails between members of Burris's team and Main Line executives in early November show that the parties were hammering out detains of a "St. Charles JV." *See* S.J.R. 178. Ms. Magnatta at

---

[6] An addendum to the BQQ explained that "Burris, in partnership with Main Line Health, proposes to retain the existing seminary building, including the chapel, and redevelop it . . ." S.J.R. 156. Kevin Breslin, Burris's associate, emailed Main Line's Donna Phillips on the same date with the message that they were "finalizing [the] presentation to the seminary board and this incorporates the latest proposal." S.J.R. 158. Mr. Burris contends that the "latest proposal" was referring to the August 2014 LOI.

[7] The BQQ included confidential information about Burris's current portfolio, existing operations, and relevant third-party consultants. It also outlined the due diligence that Mr. Burris had engaged in over the previous 19 months. S.J.R. 170.

[8] Emails exchanged between Mr. Breslin (Mr. Burris's partner) and, Dave Schmotzer, Director of Finance and Support Services at Bryn Mawr Rehab Hospital (a Main Line affiliate), indicate that the joint venture would be a limited liability company. *See* S.J.R. 236.

Main Line reported that she thought Mr. Burris and Mr. Breslin were "concerned that there is

nothing in writing that solidifies what Burris keeps telling us he is willing to do.  We are right

beside him in everything and yet have nothing to indicate that we in fact will have the first option

to reside on the site with him, etc. if he does get the approval to occupy/build."  S.J.R. 185.

Mr. Schmotzer sought additional confidential financial and operations details from Mr.

Breslin and Mr. Burris following the presentation to the Board, which they provided.  S.J.R.

243–50.  Using information Mr. Burris's team shared, Mr. Schmotzer prepared a thorough

comparison of various financial metrics between Main Line's own operations and the St. Charles

proposal.  *See e.g.*, S.J.R. 266–306.

Mr. Burris, Mr. Breslin, and various Main Line executives attended a "Strategy Council"

meeting on November 18, 2014.  Burris Aff. ¶ 46.  Mr. Burris alleges that Main Line sought

assurance during this meeting and others that it would be the exclusive partner/co-venturer with

respect to the Parcel if Mr. Burris won the bid.  Burris Aff. ¶ 47–48.  Mr. Burris allegedly

assured Main Line personnel that he had long considered Main Line a partner and co-venturer.

*Id.* Notes from the meeting, while not necessarily detailing a final arrangement, show that

indeed, the "finer points" of their relationship was the focus of discussion.  S.J.R. 192–97. A

"Financial Follow Up Meeting" was held on December 1, 2014, where the parties reviewed the

financial metrics Mr. Burris shared.  S.J.R. 251–65.  Throughout December 2014 and January

2015, Main Line requested additional proprietary information about Mr. Burris's operations,

which was disclosed.  S.J.R. 331–43; 412–13; 414–443.

At the end of January 2015, Main Line sent a revised Letter of Intent to Burris

Construction Company stating, in relevant part:

> Based on our review we have concluded that Main Line is not interested in a SNF
> [skilled nursing facility] joint venture with Burris Construction Company

("Burris"). . . . Main Line would like to propose a full management contract arrangement for a Burris-developed Skilled Nursing Facility ("Facility") to be located on the St. Charles Seminary Property.

S.J.R. 447. The January 2015 Letter of Intent outlined an 8% management fee for Main Line, Burris's involvement in managing the Facility, and a non-compete provision "to ensure that Burris does not develop, own, operate, manage, or lease to any business on the St. Charles Seminary property site that would be in direct competition with any Main Line entity." S.J.R. 448. According to Mr. Burris, on a phone call the following day, Mr. Lynch expressed that he was still viewing the arrangement as a partnership or co-venture. Burris Aff. ¶¶ 53–54. Burris contends that as of February 10, 2015, Burris had an agreement with Main Line that it would be partners/co-venturers on the construction of the skilled nursing facility, "Main Line Health at Wynnewood." Burris Aff. ¶ 55.

### III.     HFF & St. Charles Negotiate with Burris

Following the Seminary Board presentation, communications between Steve Dolan, the Chief Financial Officer at St. Charles, Bishop Senior, and Mr. Julien at HFF show that the Seminary was favoring the Burris bid and nearing a final decision. S.J.R. 350–57; 370. On December 2, 2014, Mr. Julien explained that he had spoken with Mr. Burris, and upon receipt of a final Letter of Intent from Mr. Burris, there would be a final meeting with Mr. Burris and Mr. Lynch and preparation of a ground lease. S.J.R. 353. Mr. Burris reported to Mr. Lynch at Main Line that during the December 2nd conversation, "Julien said the deal is ours." S.J.R. 379. Mr. Burris submitted the final Letter of Intent on December 27, 2014, and it stated, among other things, that discussions with Main Line have continued and that an arrangement would be finalized by the end of January. S.J.R. 382–85.[9]

---

[9] In late December 2014, communications between Mr. Julien and Bishop Senior show that they were not seriously entertaining new prospective bidders, and instead emphasizing moving forward with the Burris proposal.

St. Charles did not respond quickly to Mr. Burris's proposal. When, on March 16, 2015, Mr. Burris asked Mr. Lynch whether he had any insight into developments, Mr. Lynch replied, "nothing." S.J.R. 470. This response, as it turns out, occurred while Mr. Lynch and other Main Line executives were communicating directly with St. Charles about the Burris's bid on the Parcel. Around the same time, Mr. Dolan at St. Charles told Mr. Julien at HFF that the Burris deal "is still going to take place and hopefully in the near future." S.J.R. 472. Mr. Burris was anxious to hear about the proposal he sent in December, and throughout March and April 2015, he continued to provide HFF and St. Charles details about the project and his proposed "mezzanine" financing for it. *See, e.g.*, S.J.R. 375–76; 473; 471–98.

The Seminary clarified its position on financing the project in May. On May 12, 2015, counsel for St. Charles sent Mr. Burris a letter stating that St. Charles had decided that it would only accept a buyer with an institutional common equity capability of purchasing the Parcel, as opposed to mezzanine financing, as well as other new requirements in information requests. S.J.R. 676. After receiving the letter, Mr. Burris sought to clarify the financing terms he had secured and stated that Main Line would be operating the Post-Acute Center as an extension of their Lenkenau brand. S.J.R. 677. He also requested a meeting with Mr. Dolan at St. Charles. S.J.R. 678. Lydia Hammer, Senior Vice President of Marketing and Business Development at Main Line, upon learning that Mr. Burris sought a meeting with Mr. Dolan—while Main Line itself was communicating with the Seminary—commented to other Main Line executives "[l]et's sit back and watch this unfold." *Id.*

---

S.J.R. 390-94. A Marketing and Bid Summary shows that between January 2015 and October 2015, HFF was engaging in research, due diligence, and discussions with Mr. Burris. S.J.R. 400. In January 2015, communications between Saint Charles officials indicated that they felt an agreement with Burris was close at hand. Saint Charles indicated to other prospective bidders that it was no longer willing to consider new proposals at that time because it was "very far down the road of the development of a plan." S.J.R. 393.

In light of St. Charles's concerns about financing, Mr. Burris submitted two new Letters of Intent—on June 23, 2015[10] and July 17, 2015.  S.J.R. 680–85.  The July 17th LOI offered to purchase the Parcel for $25 million.  S.J.R. 683–85.

After submitting the July LOI, Mr. Burris contacted HFF and the Seminary at regular intervals over the following months, seeking information on where the Seminary was in its bid review process.  After requesting an update on the offer in September 2015, St. Charles informed him that discussion would resume after the Pope's upcoming visit to Philadelphia.  Burris Aff. ¶ 61.  Once the Papal visit concluded, Mr. Dolan conveyed to Mr. Burris that St. Charles needed to get the proper approvals from various Seminary committees that were scheduled to meet over the next few weeks.  He explained that if the committees recommended the project, it would go to the Seminary's Board of Directors.  S.J.R. 715.  In November 2015, Mr. Dolan informed Mr. Burris that the Board was reviewing "offers," which Mr. Burris alleges was the first indication he received that St. Charles was considering multiple offers for the Parcel.  Burris Aff. ¶ 63.  In early December, Mr. Burris expressed concerns to Bishop Senior that he seemed to have fallen out of favor with the Seminary, and understood that a competitor "may be the new 'stalking horse' for th[e] deal."  S.J.R. 783.  A few days after Mr. Burris emailed Bishop Senior, St. Charles notified him that it was in exclusive negotiations with Main Line for the Parcel.  Burris Aff. ¶ 64.

## IV.    Main Line and St. Charles Make a Deal

While negotiations were continuing with Burris and the Seminary was vetting Burris's bid, the record shows that Main Line was considering alternative proposals for St. Charles.  In

---

[10] In late June of 2015, Mr. Burris forwarded another formal proposal to Mr. Dolan.  S.J.R. 680-82.  Dolan presented the proposal to the Board of Directors at Saint Charles in mid-July.  S.J.R. 686.  On July 1, before the Burris proposal was submitted to the Seminary Board , Main Line learned the details of that offer, including how Burris planned to finance the project.  S.J.R. 378.

mid-January 2015, Main Line compiled an "Evaluation of Alternative Skilled Nursing Facility Partnerships in the Eastern Main Line Market," which compared possible partnerships with Mr. Burris and with another provider of geriatric services, the Abramson Center for Jewish Life ("Abramson"). S.J.R. 450. While it considered both, it recognized that "pursuing a management relationship with Atrium/Burris and a real estate leasing relationship with [Abramson] may be mutually exclusive, in that each party may require some exclusivity from us." S.J.R. 454. Main Line had NDAs with both Burris and Abramson. S.J.R. 461. As of February 10, 2015—the date Mr. Burris considered the Burris/Main Line agreement finalized—internal communications at Main Line stated that they would "continue to evaluate both [Burris and Abramson], until we see what happens with Seminary." S.J.R. 461. At the February 10th meeting with Main Line and the Seminary, Ms. Magnatta divulged Main Line's concerns about Mr. Burris's ability to finance the transaction. S.J.R. 463. That day, Main Line met with Stephen Dolan at the St. Charles, who expressed to Main Line executives that the meeting "gave [them] plenty to explore and hopefully get important answers." S.J.R. 462. Meanwhile, Main Line considered the possibility of doing the deal with Abramson if Burris was not approved. S.J.R. 464.

In August, Main Line decided pursue the Parcel without Mr. Burris.[11] Notes from an August 11, 2015 meeting of Main Line executives state that "Burris figured it out and has the money," and also that "MLH should own property" but that "[i]f Burris gets the deal we need to somehow partner." S.J.R. 688. A few days later, Ms. Magnatta reiterated that Main Line executives "agree that if we pursue the site it should be on our own and not with Bill Burris. . . .

---

[11] Main Line hoped for "a counter that d[id] not include Burris for the seminary" because it "could be a great opportunity for Abramson." S.J.R. 692. Main Line did not believe that they owed any obligation to Mr. Burris. Ms. Hammer explained that "we just have to make sure he doesn't have the deal locked up. I've got to believe we can craft a much more attractive offer [] and then get the land and sit on it until we decide what we want to do. We can't lose this one." *Id.* Nonetheless, Ms. Magnetta wrote to Mr. Buongiorno on September 28, 2015, explaining that "we agreed to send a letter to Steve Dolan this week and then hopefully you, myself, and Brian get together with Jack [Lynch] to discuss Bill Burris strategy." S.J.R. 695.

[T]he next step should be [Mike Buongiorno, Executive Vice President and Chief Financial Officer of Main Line Health] [] touring the space to get a better understanding of what the buildings are like, upkeep, etc. so that when we do discuss we have a better understanding of what we would be taking on." S.J.R. 689. Accordingly, on September 18th, Main Line executives toured the St. Charles facilities and met with Mr. Dolan and other St. Charles officials. S.J.R. 693. Simultaneously, Mr. Burris updated Mr. Lynch that negotiations with the Seminary would resume after the Pope's visit to Philadelphia. S.J.R. 694.

On October 1, 2015, Mr. Dolan from St. Charles sent Mr. Lynch a letter notifying him of upcoming Seminary Committee Meeting dates relevant to a potential Main Line bid. S.J.R. 696. In preparation for submitting a bid, Mr. Buongiorno emailed a proposal—which incorporated slides and plans Burris prepared—to a Main Line board member. S.J.R. 704-13. Main Line submitted its bid to acquire the Parcel for $26 million—$1 million more than Mr. Burris's offer—on October 9, 2015 and followed up with a PowerPoint presentation to the Seminary Board on November 3, 2015. S.J.R. 718–26; S.J.R. 748–53.[12] St. Charles sought to deal exclusively with Main Line and requested that several changes be made to Main Line's letter of intent. S.J.R. 784–88. Main Line considered those requests and sent a Revised Letter of Intent on November 19, 2015, which included a purchase price of $28.5 million and a $12 million option for the upper campus. S.J.R. 764–81. That same day, Mr. Dolan advised Mr. Burris that his proposal was still under review and did not mention Main Line's offers. S.J.R. 782. The next day, the Seminary notified Main Line that its offer on the lower portion was acceptable pending legal review, but made a $15 million counteroffer on the upper campus offer. S.J.R.

---

[12] After Main Line submitted its proposal, Mr. Dolan informed Mr. Burris that his proposal would be presented to the leadership of the Archdiocese and Saint Charles on the same timeline he discussed with Mr. Lynch several days earlier. S.J.R 715. On October 9, Main Line provided Saint Charles with a Letter of Intent setting forth its proposal for purchase of the Parcel, which included a higher price offering than the Burris proposal. S.J.R. 718-26. Dolan acknowledged receipt of the Letter of Intent on October 12. S.J.R. 727. Three days later, on October 15th, Mr. Dolan informed Mr. Burris that his proposal was in the process of being reviewed. S.J.R. 732.

792. Main Line accepted the counteroffer and sent another revised Letter of Intent, incorporating the counteroffer, on December 4, 2015. S.J.R. 793–802.

Main Line and St. Charles collaborated on a script to respond to Mr. Burris's inquiries. S.J.R. 804–06. The script explained that Main Line and St. Charles had entered into an exclusive period of negotiation. *Id.* Mr. Burris contends that he was made aware that there was a competing bidder around this time, but that he was not provided with the identity of the bidder. Burris Aff. ¶ 63. He was notified that the St. Charles entered into a deal with Main Line on December 9, 2015. *Id.* at ¶ 64.

Mr. Burris filed his Complaint on February 3, 2016. The Complaint sets forth ten claims, arising from Mr. Burris's position that a fiduciary relationship existed with Main Line and that Main Line used the proprietary and confidential information he provided to it for purposes of a joint venture or other legal relationship in order to facilitate the deal it ultimately reached with the Seminary. He also brings claims against the Seminary based upon the Seminary's alleged involvement in Main Line's breach of fiduciary duties or conspiratorial conduct.

Shortly after the Complaint was filed, Defendants filed Rule 12(b)(6) motions to dismiss, attaching numerous documents and affidavits that were outside the four corners of the Complaint. The Court denied the motions without prejudice and permitted Defendants to re-file the motions as motions for summary judgment. Doc. No. 18. Defendants did just that. The Court understands that, at the time of filing motions for summary judgment, only limited discovery had taken place.

## STANDARD OF REVIEW

A court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a).  An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party.  *Kaucher v. Cnty. of Bucks,* 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  *Id.* (citing *Anderson,* 477 U.S. at 248).  Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the non-moving party.  *See Anderson,* 477 U.S. at 255.  However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment."  *Betts v. New Castle Youth Dev. Ctr.,* 621 F.3d 249, 252 (3d Cir. 2010) (citing *See Williams v. Borough of West Chester,* 891 F.2d 458, 460 (3d Cir. 1989)).

The movant bears the initial responsibility for informing the Court of the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court [] that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325.  After the moving party has met the initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute."  Fed. R. Civ. P. 56(c).  Summary judgment is appropriate if the non-moving party fails to rebut by making a

factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

## DISCUSSION

The Defendants' principal argument is that, as a predicate of establishing each of the claims alleged in the Complaint, Mr. Burris must establish that a fiduciary relationship existed with Main Line. The motions are both premised on the contention that Mr. Burris's inability to present evidence establishing the existence of a partnership or other joint venture giving rise to a fiduciary relationship requires the dismissal of each of the ten counts brought in the Complaint. Of the ten counts alleged in the Complaint, most appear to be expressly premised on, reliant upon, or make reference to, the existence of a partnership or fiduciary relationship. Relying primarily upon its NDA with Mr. Burris, Main Line contends that no such relationship could have existed. The Seminary alleges that the claims alleged against it are, in large part, dependent on there being a Burris-Main Line fiduciary relationship and, taking a similar position to Main Line, accordingly urge that summary judgment is proper. As to the remaining claims, there are certain arguments raised that are independent of the existence of a partnership or fiduciary relationship.[13]

The plaintiff disagrees with Defendants' interpretation of the NDA and generally responds by arguing that as of the fall of 2014, Burris and Main Line Health had become (1) partners, (2) co-promoters, or (3) participants in a joint venture. Mr. Burris contends that under

---

[13] Separate from their challenges to the existence of a fiduciary relationship, Main Line and St. Charles both challenge Mr. Burris's ability to pursue this case as an individual. Main Line takes the position that any discussion that took place was between entities that Mr. Burris was involved with (specifically, Burris Construction Company and/or Atrium Health & Senior Living), not Mr. Burris individually. Accordingly, they argue that because he was not a party individually to any of the discussions or actions underlying the Complaint, he has no cause of action against Defendants. Mr. Burris explains, however, that the joint venture entity, which he would be involved in, was not yet created. Issues of fact, therefore, exist regarding whether Mr. Burris was acting individually or through one of his affiliate entities.

any of those legal relationships, a fiduciary duty came into being that prevented Main Line from self-dealing by later bidding on the property.

The Court concludes that questions of material fact exist as to the presence of a fiduciary relationship, which forms the crux of Defendants' motions. To the extent that Mr. Burris's other claims are not reliant upon the existence of a fiduciary relationship, the Court determines that it cannot, with the record before it, grant summary judgment for Defendants, particularly given the juncture at which these motions were filed.

## I.      Claims that Rely on the Existence of a Fiduciary Relationship or Partnership

Defendants primarily argue that, based upon the record as it currently stands, a reasonable jury could not conclude that a Burris-Main Line fiduciary relationship existed. This position is largely rooted in Main Line's reliance on the NDA. For the following reasons, the Court rejects the notion that the NDA commands the conclusion that a fiduciary relationship did not exist, and concludes that issues of material facts preclude summary judgment.

### A.      Non-Disclosure Agreement

The defendants' argument focuses on the September 30, 2014 Non-Disclosure Agreement. This position is somewhat myopic, however, because the existence of a NDA alone does not foreclose the possibility that a partnership or other fiduciary relationship could have arisen at a later point. Indeed, Mr. Burris points to the period in late October when his team and Main Line worked together to prepare the BQQ at the Seminary's request, and jointly presented to the Board.

Main Line relies upon 2011 District of New Jersey decision, *Coyle v. Mathai*, No. CIV.A. 11-5185 JEI, 2011 WL 5828522 (D.N.J. Nov. 18, 2011), where the court dismissed a claim against an investor brought by a real estate broker based upon the investor's alleged misuse of

confidential information obtained from the broker in the course of negotiations to purchase certain properties. The parties had entered into a non-disclosure agreement to ensure the confidentially of information exchanged during negotiations. Ultimately, however, the investor declined to use the broker and purchased the property in question through the aid of others. The Court held that the plaintiff broker failed to state a claim for violation of the agreement, given that the agreement provided no requirement that the defendant involve the plaintiff as a broker in the deal or otherwise sanction the defendant's purchase.

While the NDAs in both cases did not expressly provide for the establishment of fiduciary or partnership agreement between the parties, the factual circumstances surrounding the negotiations differ. The argument in *Coyle* centered on an absence of breach because the NDA in that case "include[d] no requirement that the real estate transactions involve [Plaintiff] as broker nor d[id] it require that [Plaintiff] 'sanction' Defendant['s] . . . purchase of any real estate." *Id.* at *5. In this case, the framing differs. While the NDA here recognizes that it did not create a joint venture or partnership, and the integration clause stated that the agreement constituted the entire understanding between the parties, that understanding was "with respect to the subject matter hereof," which was exchange of confidential information.[14] *See* S.J.R. 67. Accordingly, the question here is whether the Mr. Burris and Main Line, after the NDA was signed, entered into a partnership or another arrangement giving rise to a fiduciary relationship.

---

[14] Main Line seeks to distinguish this case from *Den-Tal-Ez, Inc. v. Siemens Capital Corp.*, 389 Pa. Super. 219, 566 A.2d 1214 (1989), upon which Mr. Burris relies. It correctly notes that two agreements were present between the parties in *Den-Tal-Ez*: a non-disclosure agreement containing an integration clause and a letter of intent for the acquisition of plaintiff by defendant. Main Line argues that the non-disclosure agreement was narrower than the one here and highlighted the emphasis the state court placed on the separate letter of intent. Here, there is no separate letter of intent between Main Line and Burris. Main Line neglects to recognizes that regardless of whether there is a stand-alone letter of intent contemplating the alleged Burris-Main Line agreement, the plain language of the NDA here limits it to the subject matter—confidential information—and expressly recognizes parallel negotiations about another agreement. That the NDA stated it did not create a partnership or joint venture does not command the conclusion that a partnership or joint venture did not exist, or could not exist.

For the following reasons, the Court concludes that questions of material fact exist that prevent the Court from concluding, as a matter of law, that a fiduciary relationship did not exist.

### B.        Creating a Fiduciary Relationship

In response to Defendants' arguments that the record cannot support a finding that a Burris-Main Line fiduciary relationship existed, Mr. Burris sets forth multiple avenues by which a fiduciary relationship could have been formed. He argues that the record could support a partnership, joint venture, or co-promoter relationship. Interpreting the facts in the light most favorable to Mr. Burris, genuine disputes of material fact exist that could support any of the relationships Mr. Burris outline. Therefore summary judgment as to the claims reliant upon a fiduciary relationship is denied.

In a Pennsylvania general or limited partnership, "there is a fiduciary relationship between partners. Copartners owe to one another the duty of the finest loyalty." *Rahemtulla v. Hassam*, 539 F. Supp. 2d 755, 778 (M.D. Pa. 2008) (internal alterations omitted) (quoting *Clement v. Clement*, 436 Pa. 466, 260 A.2d 728, 729 (1970)); *see also Poeta v. Jaffe*, 51 Pa. D. & C. 4th 78, 84 (Pa. Ct. Com. Pl. 2001) ("In general, partners owe a fiduciary duty to each other to act in good faith during the life of the partnership."); 15 Pa. Cons. Stat. Ann. § 8334 (partners are accountable as fiduciaries to each other). As part of their fiduciary relationship, "each [partner] is under a duty to act for the benefit of all and not to gain individual advantage at the expense or to the detriment of other partners." *Bracht v. Connell*, 313 Pa. 397, 402, 170 A. 297, 298 (1933).

"A partnership is generally said to be created when persons join together their money, goods, labor, or skill for the purpose of carrying on a trade, profession, or business and when there is community of interest in the profits and losses." *Lamb v. Smith*, 183 F.2d 938, 941–42

(3d Cir. 1950). The black letter law of Pennsylvania provides that "[a] written agreement is not necessary to establish a partnership; its existence may be implied from a consideration of all the attending facts and circumstances." *Abel v. Am. Art Analog, Inc.*, 838 F.2d 691, 696 (3d Cir. 1988) (citing *Barbet v. Ostovar*, 273 Pa. Super. 256, 265 (1979); *Gohen v. Gravelle,* 411 Pa. 520, 522 (1963)). The existence of a partnership is predicated upon the intent of the parties; as in contract, however, the intent of the parties is evaluated based upon "the intent a reasonable person would apprehend in considering the parties' behavior" not on the subjective intent of the parties. *American Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 582 (3d Cir. 2009).

The existence of a partnership is ultimately a question of fact. *Knit With v. Knitting Fever, Inc.*, 742 F. Supp. 2d 568, 580 (E.D. Pa. 2010) (citing *Abel*, 838 F.2d at 695). Testimony directly from purported partners in the alleged partnership may be sufficient to prove the existence of a partnership, so long as those verbal representations evidence the clear, mutual assent necessary under Pennsylvania law. *Id.* "[A] partner's commitment to a partnership may be established merely by conduct which manifests an intention that a party be considered a partner." *Id.* (internal quotation marks omitted).

Here, Mr. Burris has pointed to evidence establishing at least a disputed material fact regarding the existence of a partnership between himself and Main Line Health as of the October 29, 2014 presentation to the Seminary. Defendants almost exclusively rely on the fact that that the September 30, 2014 Non-Disclosure Agreement disclaimed the existence of an agreement to proceed as a partnership as of that point. This agreement, however, expressly noted the concurrent negotiations between the parties were taking place and contemplated the possibility that the result of these negotiations would be the creation of a partnership or joint venture arrangement. The record includes evidence of conduct on Main Line Health's part consistent

with the existence of a partnership—namely working with Burris to present the project to the Seminary. Prior to this, the two worked together to complete the requested BQQ, which specifically stated that Burris was "in partnership" with Main Line Health to retain the property. In addition, Mr. Burris avers in his affidavit that Mr. Lynch represented his intention to Mr. Burris to enter into a 50/50 partnership for the acquisition, development, and operation of Main Line Health at Wynnewood. While email exchanges between Main Line executives, and Main Line's shifting position vis-à-vis Mr. Burris may raise doubts about whether a Burris-Main Line partnership existed, those inconsistencies or shifts are ultimately for a jury, not the Court, to evaluate.

In the alternative, Mr. Burris argues that even if the record does not establish the existence of a partnership in the fall of 2014, the record can nevertheless establish that he and Main Line were joint venturers. As in partnerships, the parties to a joint venture owe "'obligations of loyalty, fairness, good faith and full disclosure toward his fellow co-adventurers.'" *Hotel Employees & Rest. Local No. 274 Health & Welfare Fund v. Stadium Hotel Rest. Grp., Inc.,* No. 10-1279, 2012 WL 993525, at *3 (E.D. Pa. Mar. 26, 2012) (quoting *McRoberts v. Phelps*, 391 Pa. 591, 138 A.2d 439, 445 (1958)). "A joint venture has been defined as a 'special combination of two or more persons, where, in some specific venture, a profit is jointly sought without any actual partnership or corporate designation.'" *McRoberts*, 391 Pa. at 598, 138 A.2d at 443 (quoting 30 Am. Jur., Joint Adventures, § 3). The existence of a joint venture is based upon the consideration of a number of factors, but ultimately is a question of fact and the existence cannot be boiled down to a fixed rule applicable to all situations. Essential factors include:

> (1) each party to the venture must make a contribution, not necessarily of capital, but by way of services, skill, knowledge, materials or money; (2) profits must be

shared among the parties; (3) there must be a 'joint proprietary interest and right of mutual control over the subject matter' of the enterprise; (4) usually, there is a single business transaction rather than a general and continuous transaction.

*McRoberts*, 391 Pa. at 599, 138 A.2d at 443–44.

The plaintiff proposes a third means, co-promotion, through which a fiduciary duty could have arisen between Mr. Burris and Main Line. A promoter is one who actively assists in creating, projecting and organizing a corporation. Such promoters owe fiduciary duties to their co-promoters and the ultimate corporation. *See Densmore Oil Co. v. Densmore*, 64 Pa. 43, 50 (1870) ("[W]here persons form such an association, or begin or start the project of one, from that time they do stand in a confidential relation to each other, and to all others who may subsequently become members or subscribers, and it is not competent for any of them to purchase property for the purposes of such a company, and then sell it at an advance without a full disclosure of the facts."); *see also First Mechanics Bank of Trenton, N.J., v. Comm'r of Internal Revenue*, 91 F.2d 275, 278 (3d Cir. 1937) ("[I]f the person rendering the services is himself the promoter or an original party to the enterprise, he has usually been held to have an interest therein as joint adventurer with the others.").

For essentially the same reasons that a jury could determine that a Burris-Main Line partnership existed, it could find that a joint venture was created or that the two were co-promoters.[15] Put simply, there is evidence that Mr. Burris and Main Line had a relationship wherein they both understood that they would work towards securing the Parcel in order to

---

[15] In supplemental briefing following oral argument, Main Line relies upon *Putnam v. Williams*, 652 F.2d 497, 498– 501 (5th Cir. 1981). In *Putnam*, the Fifth Circuit concluded that two individuals were not joint-venturers or co-promoters because the appellee had not assumed any duties on behalf of the corporation and "did not assist in the selection of the franchise's legal counsel, public relations specialists or coach." *Id.* at 501. The Court came to this conclusion despite press releases referring to the two individuals as partners. Setting aside that *Putnam* is not controlling here, there is evidence in the record that Main Line assisted in navigating zoning issues and assisted by making recommendations to professionals it had engaged in the past. A jury ultimately may be unconvinced that a Burris-Main Line fiduciary relationship was formed, but the Court will not make such a declaration at this juncture.

operate a skilled nursing facility, to which they would both contribute and share in the profits. Assertions or evidence otherwise, while relevant, are not dispositive. *United States v. USX Corp.*, 68 F.3d 811, 827 (3d Cir. 1995), as amended (Dec. 14, 1995) ("Where . . . the facts permit competing inferences concerning the existence of an agreement to form a joint venture, the issue must be submitted to the fact finder.").

At oral argument, counsel for Main Line agreed with the Court's characterization that the differing label for the relationship at issue in this case is not so much about securing "the significance of the label qua label, but really about the idea as a notion of a relationship, no matter what you call it." July 8, 2016 Hearing Tr. 78:3–7. While the precise label of the relationship in this case may be a moving target, the Court cannot, at this juncture, state as a matter of law that no fiduciary relationship existed between the parties. Consequently, those claims reliant on a Burris-Main Line fiduciary relationship will proceed.[16]

## II. Claims That Do Not Rely on the Existence of a Fiduciary Relationship or Partnership

---

[16] This includes the aiding and abetting claim against the Seminary. Mr. Burris alleges that St. Charles aided and abetted Main Line's alleged breach of fiduciary duty and tortious conduct. Compl. ¶¶ 83–90. The elements of a cause of action for aiding and abetting breach of fiduciary duty pursuant to Pennsylvania law are: (1) a breach of a fiduciary duty owed to another; (2) knowledge of the breach by the aider and abettor; and (3) substantial assistance or encouragement by the aider and abettor in effecting that breach. *DePuy Synthes Sales, Inc. v. Globus Med., Inc.*, No. CV 17-1068, 2017 WL 1493365, at *12 (E.D. Pa. Apr. 26, 2017) (citing *Chicago Title Ins. Co. v. Lexington & Concord Search & Abstract, LLC*, 513 F. Supp. 2d 304, 317 (E.D. Pa. 2007)).[16]

As the Court has recognized, there are issues of material fact regarding a breach of fiduciary duty by Main Line. While the Seminary argues that it was not aware of the nature of the fiduciary relationship between Main Line and Mr. Burris or knowledge of the breach, the record supports the conclusion that it was, in fact aware of a fiduciary relationship, if indeed one existed. The October 2014 BQQ, submitted before Mr. Burris and Mr. Lynch's presentation to the Seminary on October 29, 2014, represents that Mr. Burris and Main Line were operating as partners for purpose of the acquisition of the Parcel.

With respect to the requirement that the Seminary provided "substantial assistance or encouragement" to Main Line in its breach of duty, Mr. Burris points to a timeline of interactions between Seminary and Main Line, starting in the fall of 2014, and culminating with Seminary's acceptance of the Main Line bid in the winter of 2015. These interactions—which Mr. Burris was unaware of—included meetings, solicitations of offers from Main Line, and the Seminary's potential willingness to modify its normal vetting and bidding procedures for Main Line. All of this appears to give rise to the reasonable inference of assistance to Main Line in acting to breach the duty it owed to Mr. Burris.

Defendants have also raised arguments for summary judgment that are not necessarily dependent upon the existence of a legal relationship between Burris and Main Line. Those claims include a claim for conversion of intangible property and civil conspiracy.[17] Issues of material fact independent of the existence of such a relationship exist as to the conversion claim.

A.    **Conversion (Count V)**

Count V of the Complaint, against Main Line, alleges conversion of confidential business records. Mr. Burris alleges that Main Line misappropriated his work product, business model, business plans, financial projections, pro-formas, due diligence, technical construction drawings, traffic studies, strategy, goodwill and other valuable information relating to his efforts to purchase and develop the Parcel for its own exclusive benefit. Main Line argues that these claims must fail for two reasons. First, the types of intangible property allegedly converted are not the types of property protected by Pennsylvania law. Main Line's Br. 19. Second, Main Line contends that no information protected by the Non-Disclosure Agreement between it and Burris or claimed by Mr. Burris was used in the acquiring the Parcel and that all information used to that end was developed independently. *Id.* at 20.

Pursuant to Pennsylvania law, conversion is "the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification." *Pierre & Carlo, Inc. v. Premier Salons, Inc.*,

---

[17] Mr. Burris points out in his response that the constructive trust, unjust enrichment claims, and unfair competition claims are not predicated upon a fiduciary relationship. Pl. Br. 158–62. Main Line, however, bases its challenges on an absence of fiduciary duty and the Seminary similarly references the absence of a Burris-Main Line fiduciary relationship. The Seminary also challenges that constructive trust is not an independent cause of action. Courts have, however, construed constructive trust claims as claims for unjust enrichment. *Brock & Co. v. Kings Row Assocs.*, No. CIV.A. 04-CV-2096, 2004 WL 2624864, at *5 (E.D. Pa. Nov. 17, 2004) ("Because a constructive trust is an equitable remedy and not a separate, specific cause of action, [it] will be construed as a claim for unjust enrichment."). With the record before it, and given that the motions for summary judgement here were filed prior to the parties' actual engagement in discovery, the Court declines to grant summary judgment on these claims. Similarly, the Court will not make a determination at juncture as to the permanent injunction or appropriateness of punitive damages.

713 F. Supp. 2d 471, 480 (E.D. Pa. 2010) (quoting *L.B. Foster Co. v. Charles Caracciolo Steel & Metal Yard, Inc.*, 777 A.2d 1090, 1095 (Pa. Super. Ct. 2001)).

The tort of conversion applies to intangible property only with respect to "the kind of intangible rights that are customarily merged in, or identified with, a particular document," such as a deed or a stock certificate. *Gabriel v. Giant Eagle, Inc.*, 124 F. Supp. 3d 550, 573 (W.D. Pa. 2015) (citing *Apparel Bus. Sys., LLC v. Tom James Co.*, No. 06–1092, 2008 WL 858754, at *18 (E.D. Pa. Mar. 28, 2008)). Intangible property like software or a copyright that is not necessarily inseparable from a physical document, however, has been found insufficiently tangible to allow for a conversion claim. *See Apparel Bus.*, 2008 WL 858754, at *18. More recent district court opinions have held that Pennsylvania law recognizes a claim for conversion as to business information such as customer lists. *Pierre & Carlo.*, 713 F. Supp. 2d at 481 (citing *Bancorp Bank. v. Isaacs*, No. 07–1907, 2010 WL 1141336, at *8 (E.D. Pa. Mar. 25, 2010).

With respect to the conversion of business information specifically, Pennsylvania law recognizes a cause of action in accordance with the Restatement of Torts § 759. *Pierre & Carlo.*, 713 F. Supp. 2d at 481. In order to state a claim for conversion of business information, the plaintiff "must allege acquisition of confidential business information through misconduct." *Id.* (quoting *Bancorp*, 2010 WL 1141336, at *8). "Confidential information" includes "information about one's business whether or not it constitutes a trade secret." *Pierre & Carlo.*, 713 F. Supp. 2d at 481–82. "Misconduct" includes "inducing employees or others to reveal the information in breach of duty" and "fraudulent misrepresentations." *Id.* at 482.

Main Line argues that Pennsylvania law does not recognize a tort of conversion for the type of material at issue here. It is true that Mr. Burris alleges the conversion of things like "good will," "know how," and "methods," which are not customarily merged into a tangible

document. However, the Complaint also includes other more discrete material, included in the record, such as proprietary business models, business plans, financial projections, technical construction drawings, traffic studies, plans and specifications. These materials of the type that is customarily merged into or identified with a particular tangible document. Mr. Burris has established that he considered these materials to be confidential and the record, when viewed in the light most favorable to him, establishes that Main Line was in receipt of these materials. Further, because Mr. Burris alleges that he was repeatedly assured of Main Line's interest in a joint venture or partnership, even after Main Line began to consider alternative courses of action, there is at least an issue of material fact as to whether he was induced to provide this information through fraudulent misrepresentations. Therefore, Main Line's first challenge to Mr. Burris's conversion claim is unavailing.

Main Line's second argument—that none of the confidential information provided by Burris was used in its efforts to acquire the Parcel—likewise fails. Main Line contends that it was already in possession of all information necessary for it to make the offer because the Parcel's availability was publicly-known and because of Main Line's location adjacent to the Seminary and, thus, the Parcel. Main Line relies heavily upon the notion that, at the time of the bid, it was not reliant upon Mr. Burris's plans to develop the property and instead sought to acquire it "with no predetermined use." S.J.R. 752.

Generally, whether or not Main Line used the information, the question of conversion does not necessarily relate to the acquisition of the Parcel, but rather the denial of Mr. Burris's rights in his property. Because the information Main Line obtained was the type protected by the tort of conversion and the record allows the inference that the information was confidential and

obtained through misrepresentations, issues of material fact regarding the conversion of the material alleged in the Complaint exist, precluding summary judgment.

## B. Civil Conspiracy (Count VIII)

The Complaint alleges that Main Line and the Seminary, through their respective agents, engaged in civil conspiracy to effectuate various other claims set forth in the Complaint. The elements of a cause of action for civil conspiracy pursuant to Pennsylvania law are: "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." *DePuy Synthes Sales*, 2017 WL 1493365, at *16 (quoting *Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 313 (3d Cir. 2003)). In order for a civil conspiracy claim to be actionable, it must be based upon an existing independent wrong or tort that would constitute a valid cause of action if committed by one actor. *Id.*

Proof of malice (i.e., an intent to injure) is essential in proving civil conspiracy. *Id.* Judges in this District have interpreted the civil conspiracy malice requirement differently. *See Spear v. Fenkell*, No. CV 13-2391, 2016 WL 5661720, at *54 (E.D. Pa. Sept. 30, 2016), *clarified on denial of reconsideration*, No. CV 13-2391, 2016 WL 7475814 (E.D. Pa. Dec. 29, 2016) (summarizing the differing views within in the Eastern District of Pennsylvania). Some courts have reasoned that that Pennsylvania requires "unadulterated malice;" or an allegation that the *sole* purpose of the conspiracy was to injure the plaintiff, and that showing an entity acted for professional reasons (and therefore, not solely to injure the plaintiff) negates a finding of malice. *Id.*; *DePuy Synthes Sales*, 2017 WL 1493365, at *16; *see also Sarpolis v. Tereshko*, 26 F. Supp. 3d 407, 423–24 (E.D. Pa. 2014) (declining to infer malice where the plaintiff admitted that the

intent of the conspiracy was to advance defendants' respective business interests), aff'd, 625 Fed. App'x 594 (3d Cir. 2016); *Bro-Tech Corp. v. Thermax, Inc.*, 651 F. Supp. 2d 378, 419 (E.D. Pa. 2009) ("It must be shown 'that the *sole* purpose of the conspiracy was to injure the plaintiffs. This necessary proposition is negated by a showing that the acts alleged were done for professional or business benefit."). When this Court was faced with the question in *Power Restoration Int'l, Inc. v. PepsiCo, Inc.*, No. CIV.A. 12-1922, 2014 WL 1725041, at *6 (E.D. Pa. Apr. 30, 2014), it permitted a state law conspiracy claim to proceed where the harm to plaintiff was not simply a "side-effect" of lawful activity and instead the result of intentional, improper, activity. *Id.* ("[W]hen improper actions form the basis for the civil conspiracy claim, then the injured party can adequately allege an intent to injure even if the conspirators also monetarily benefited from the conspiracy."). While this Court recognizes that others may have read the malice requirement more stringently, requiring unadulterated malice is admittedly not required. *See Spear*, 2016 WL 5661720, at *55.

Mr. Burris has set forth a timeline of secret interactions between St. Charles and Main Line in which Main Line could have obtained confidential business information. The chain of events includes meetings, solicitations of offers from Main Line without Mr. Burris's knowledge, and communications by both St. Charles and Main Line to Mr. Burris with the purpose of concealing those negotiations. The record supports the inference that Main Line and St. Charles collaborated in their efforts to conceal those discussions from Mr. Burris. As the Court has detailed, disputes of material fact preclude summary judgment on the underlying torts. With the record before it, and particularly given the fact that the parties' discovery efforts prior to filing motions for summary judgment were so limited, the Court will deny summary judgment on the civil conspiracy claim.

**CONCLUSION**

For the foregoing reasons, the Court will deny Defendants' motions for summary judgment. An appropriate Order follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge